No. 25-2061

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

BRUCE KONYA, SIMON SHIFF, STEPHEN SCHWARZ, and DIANA
VASQUEZ, individually and as representatives of a class of participants
and beneficiaries on behalf of the Lockheed Martin Corporation Salaried
Employee Retirement Program and the Lockheed Martin Aerospace
Hourly Pension Plan,

*Plaintiffs-Appellees,*

v.

LOCKHEED MARTIN CORPORATION,

*Defendant-Appellant.*

On Appeal from the United States District Court for
the District of Maryland, No. 24-cv-750
(Hon. Brendan A. Hurson)

## APPELLANT'S PAGE-PROOF OPENING BRIEF

Christopher J. Boran
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1146

Nicole A. Saharsky
Reginald R. Goeke
Minh Nguyen-Dang
Zachary Krislov
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. <u>25-2061</u>        Caption: <u>Konya et al. v. Lockheed Martin Corporation</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Lockheed Martin Corporation</u>
(name of party/amicus)

_____

 who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☒YES ☐NO

2.    Does party/amicus have any parent corporations?                  ☐YES ☒NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                          ☒YES ☐NO
      If yes, identify all such owners:
       State Street Corporation
       State Street Bank and Trust Company

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☒NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question) ☐YES ☒NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding? ☐YES ☒NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim? ☐YES ☒NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Nicole A. Saharsky      Date: December 3, 2025

Counsel for: Lockheed Martin Corporation

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT .....................................................3

STATEMENT OF THE ISSUE ...........................................................4

STATEMENT OF THE CASE..............................................................4

   A.   Statutory Background ......................................................4

   B.   Factual Background .........................................................8

   C.   Procedural History.........................................................10

        1.   Plaintiffs' Complaint ............................................10

        2.   The District Court's Motion-To-Dismiss Decision................12

        3.   The District Court's Certification Decision............................13

        4.   Decisions In Other Cases ......................................13

SUMMARY OF THE ARGUMENT.................................................14

STANDARD OF REVIEW .............................................................19

ARGUMENT...................................................................................19

THE COMPLAINT SHOULD BE DISMISSED BECAUSE
PLAINTIFFS HAVE NOT PLAUSIBLY PLEADED ARTICLE III
STANDING....................................................................................19

   A.   Article III Standing Requires An Actual Or Imminent
Injury ..............................................................................19

   B.   Plaintiffs Have Not Pleaded An Actual Injury .............24

   C.   Plaintiffs Have Not Pleaded An Imminent Injury .......29

        1.   Plaintiffs Have Not Alleged Facts Showing That
Nonpayment Is Certainly Impending .....................30

        2.   Plaintiffs Have Not Alleged Facts Showing A
Substantial Risk Of Imminent Nonpayment.........34

        3.   The District Court Erred In Concluding That Plaintiffs
Had Pleaded An Injury Sufficient For Standing..................37

           a.   Standing Requires A Substantial Absolute Risk Of
Harm, Not Merely Any Increased Risk............................38

|  |  | b. | The District Court Erred In Its Assessment Of The Supposed Increased Risk ................................................. 44 |
| D. | | | Seeking Equitable Relief For Breach Of Fiduciary Duty Is Not Enough To Confer Standing .................................................... 47 |
|  | 1. | | *Thole* Squarely Forecloses This Theory Of Standing ............ 48 |
|  | 2. | | The District Court's Reliance On *Peters* Is Misplaced .......... 49 |
| E. | | | Requiring An Actual Or Imminent Harm Best Serves ERISA's Purposes ......................................................................... 52 |
|  | 1. | | ERISA Expressly Permits Annuity Buyout Transactions .... 52 |
|  | 2. | | Plaintiffs Would Have Recourse If There Was An Imminent Risk Of Nonpayment ............................................ 56 |
| CONCLUSION ............................................................................................. 58 |

# TABLE OF AUTHORITIES

**Cases**             **Page(s)**

*Beck v. McDonald,*
848 F.3d 262 (4th Cir. 2017) .................................. 8, 17, 31-35, 37, 40, 41

*Beck v. PACE Int'l Union,*
551 U.S. 96 (2007) ......................................................................5, 6, 47, 53

*Berkley v. Mountain Valley Pipeline, LLC,*
896 F.3d 624 (4th Cir. 2018) ...................................................................19

*Bueno v. Gen. Elec. Co.,*
No. 24-cv-822, 2025 WL 2719995
(N.D.N.Y. Sept. 24, 2025).....................................14, 26, 27, 36-38, 42, 45

*Camire v. Alcoa USA Corp.,*
No. 24-cv-1062, 2025 WL 947526
(D.D.C. Mar. 28, 2025) ............................................. 13, 33, 34, 36, 37, 57

*City of Martinsville v. Express Scripts, Inc.,*
128 F.4th 265 (4th Cir. 2025)....................................................................51

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ............................................ 15, 16, 21, 29, 31, 34, 42

*David v. Alphin,*
704 F.3d 327 (4th Cir. 2013) ...........................15, 22-26, 29, 30, 36, 42-44

*Doherty v. Bristol-Myers Squibb Co.,*
No. 24-cv-6628, 2025 WL 2774406 (S.D.N.Y. Sept. 29, 2025) ...............14

*Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.,*
892 F.3d 1249 (D.C. Cir. 2018) ...............................................................41

*FDA v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ..................................................................................21

*Fifth Third Bancorp v. Dudenhoeffer,*
573 U.S. 409 (2014) ............................................................................52, 57

**Cases (continued)**                                                    **Page(s)**

*Goines v. Valley Cmty. Servs. Bd.*,
    822 F.3d 159 (4th Cir. 2016) ................................................................. 8-10

*Holland v. Consol Energy, Inc.*,
    781 F. App'x 209 (4th Cir. 2019) ............................................................ 32

*Holmes v. Elephant Ins.*,
    156 F.4th 413 (4th Cir. 2025) ............................... 20, 29, 30, 35, 37, 40, 41

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999) ........................................................................ 5, 6, 53

*Hughes v. Nw. Univ.*,
    595 U.S. 170 (2022) ................................................................................. 5

*John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
    78 F.4th 622 (4th Cir. 2023) ....................................................... 21, 30, 34

*KBC Asset Mgmt. NV v. DXC Tech. Co.*,
    19 F.4th 601 (4th Cir. 2021) .................................................................. 46

*Lee v. Verizon Commc'ns, Inc.*,
    837 F.3d 523 (5th Cir. 2016) ............................................................ 41, 42

*Lockheed Corp. v. Spink*,
    517 U.S. 882 (1996) ................................................................................. 4

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ........................................................................ 20, 30

*Maryland v. U.S. Dep't of Agric.*,
    151 F.4th 197 (4th Cir. 2025) ................................................................ 20

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ...................................................................... 16, 29, 34

*O'Leary v. TrustedID, Inc.*,
    60 F.4th 240 (4th Cir. 2023) .................................................................. 31

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                   **Page(s)**

*Peters v. Aetna Inc.*,
   2 F.4th 199 (4th Cir. 2021)...................................................... 13, 18, 48-51

*Piercy v. AT&T Inc.*,
   No. 24-cv-10608, 2025 WL 2505660 (D. Mass. Aug. 29, 2025) ...............14

*Pub. Citizen, Inc. v. NHTSA*,
   489 F.3d 1279 (D.C. Cir. 2007) ..................................................................27

*Schoen v. ATI, Inc.*,
   No. 24-cv-1109, 2025 WL 2970339 (W.D. Pa. Oct. 7, 2025)....................14

*Smith v. Mirman*,
   749 F.2d 181 (4th Cir. 1984)......................................................................28

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ...................................................................................20

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) .............................................................................21, 29

*Thole v. U.S. Bank N.A.*,
   590 U.S. 538 (2020) .......................................... 2, 13, 15, 16, 18, 21-29, 34,
                                                36, 41, 42, 48, 49, 51, 52, 58

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
   980 F.3d 879 (3d Cir. 2020)..................................................................38, 41

*Tibble v. Edison Int'l*,
   575 U.S. 523 (2016) .....................................................................................4

*Till v. SCS Credit Corp.*,
   541 U.S. 465 (2004) ...................................................................................27

*TransUnion LLC v. Ramirez*,
   594 U.S. 413 (2021) ........................................ 15, 20, 21, 39, 40, 42, 51, 52

# TABLE OF AUTHORITIES
## (continued)

**Cases (continued)**                                                      **Page(s)**

*Tsao v. Captiva MVP Rest. Partners, LLC,*
    986 F.3d 1332 (11th Cir. 2021) .................................................................41

*Winsor v. Sequoia Benefits & Ins. Servs., LLC,*
    62 F.4th 517 (9th Cir. 2023).....................................................................51

**Constitution, Statutes, Regulations, and Rules**

U.S. Const. art. III, § 2, cl. 1 ........................................................................19

28 U.S.C. § 1292(b)............................................................................3, 4, 13

28 U.S.C. § 1331 ...............................................................................................3

Privacy Act, 5 U.S.C. § 552a *et seq.*...............................................................31

Employee Retirement Income Security Act of 1974,
    29 U.S.C. § 1001 *et seq.*.................................................................................3

    29 U.S.C. § 1001 ........................................................................................4

    29 U.S.C. § 1001(b) ...................................................................................4

    29 U.S.C. § 1002(21)(A) ............................................................................5

    29 U.S.C. § 1056(d)(1)..............................................................................28

    29 U.S.C. § 1104(a) ...................................................................................4

    29 U.S.C. § 1104(a)(1)................................................................................5

    29 U.S.C. § 1104(a)(1)(A)..........................................................................11

    29 U.S.C. § 1104(a)(1)(B)........................................................................5, 11

    29 U.S.C. § 1106 .......................................................................................11

    29 U.S.C. § 1106(a) ....................................................................................5

    29 U.S.C. § 1106(b) ....................................................................................5

**Statutes and Regulations (continued)**                          **Page(s)**

29 U.S.C. § 1113(1)(A) .........................................................................19, 56

29 U.S.C. § 1132(a)(9)................................................................19, 54, 56

29 U.S.C. § 1132(e)(1) ................................................................................3

29 U.S.C. § 1341(b)(3)(A)(i) .................................................................6, 52

29 C.F.R. § 2509.95-1 ............................................................................45, 53

**Other Authorities**

Aon, *U.S. Pension Risk Transfer Update* (Feb. 2025) ...................................8

Athene Life Re, *Home Page* ...........................................................................9

Emp. Benefits Sec. Admin., U.S. Dep't of Lab., *Department of
   Labor Report to Congress on Employee Benefits Security
   Administration's Interpretive Bulletin 95-1* (2024) ....................45, 46, 54

ERISA Advisory Council, U.S. Dep't of Lab., *Statement of the
   2023 Advisory Council on Employee Welfare and Pension
   Benefit Plans to the U.S. Department of Labor Regarding
   Interpretive Bulletin 95-1* (Aug. 29, 2023)...........................................8, 47

Nat'l Ass'n of Ins. Comm'rs, *Pension Risk Transfer* (May 9, 2024)...............7

Nat'l Ass'n of Ins. Comm'rs, *Reinsurance* (May 9, 2024) ...............................7

Nat'l Org. of Life & Health Ins. Guar. Ass'ns, *What Happens
   When an Insurance Company Fails*...........................................................7

Fiona Ng et al., *Pension Risk Transfer: Staying Current in a
   Rapidly Evolving Market*, Milliman (June 23, 2023)................................7

Pension Benefit Guar. Corp., *PBGC's Single Employer
   Guarantee Outcomes* (May 2019).............................................................55

Prudential Fin., Inc., *Annual Report (Form 10-K)* (Feb. 13, 2025) .............46

## INTRODUCTION

This interlocutory appeal raises the question whether a plaintiff has Article III standing when the complaint does not allege that the plaintiff has suffered any actual harm or that the plaintiff faces an imminent risk of future harm. The answer is no.

This question arises in the context of an ERISA lawsuit about pension benefits. Plaintiffs were participants in two defined-benefit pension plans that Defendant Lockheed Martin Corporation (Lockheed Martin) sponsored. In 2021 and 2022, Lockheed Martin engaged in annuity buyout transactions, which are transactions that ERISA expressly permits. In those transactions, Lockheed Martin transferred the plans' assets and obligations to Athene Annuity and Life Insurance Company (Athene), an insurer that specializes in paying annuities. As a result, Athene became responsible for paying Plaintiffs' pension benefits going forward.

In this lawsuit, Plaintiffs challenge the transactions. Their claims have a fundamental, threshold problem: Plaintiffs have not pleaded any Article III injury. As the district court held, Plaintiffs have not alleged an actual injury because they have received all their benefits to date and remain entitled to those benefits in the future. And Plaintiffs have not alleged an imminent future injury, either. They have not plausibly pleaded that

1

nonpayment is certainly impending or that they face a substantial risk of imminent nonpayment, as the Supreme Court's and this Court's precedents require. Athene has an A+ credit rating, and Plaintiffs do not allege that Athene has ever failed to pay benefits to any beneficiary. Plaintiffs' assertions about their possible future risk are entirely speculative.

Nevertheless, the district court held that Plaintiffs had "barely" "eked out" standing based on an increased risk of future nonpayment. Dkt. 79 (Op.), at 19-20. That holding is incorrect. The crux of Plaintiffs' allegations is that Athene is somewhat riskier than certain competitors they would prefer. But even if true, that relative risk does not mean that Plaintiffs face an actual or imminent harm, as other district courts evaluating similar claims have explained.

In the alternative, Plaintiffs argue that they have standing to seek equitable relief solely by alleging a fiduciary breach. The Supreme Court expressly rejected that argument in *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), holding that for a participant in a defined-benefit plan, alleging a fiduciary breach does not alone establish standing.

This lawsuit is a direct attack on transactions that ERISA expressly allows and that the Department of Labor carefully oversees. If Plaintiffs here could sue, beneficiaries could challenge virtually any annuity buyout

2

transaction, overriding Congress's decision to allow the transaction in the first place.

There is no reason to distort Article III standing to allow this lawsuit. If there came a point in the future that Plaintiffs' benefits were in imminent jeopardy, they could sue then. And in the meantime, Plaintiffs are protected by state insurance regulators, which monitor Athene and require it to provide regular funding disclosures and could intervene if benefits became underfunded, as well as by state guaranty associations that guarantee coverage in the unlikely event that Athene were to fail.

This Court should reverse.

## JURISDICTIONAL STATEMENT

Plaintiffs bring claims under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.* *See* Dkt. 1 (Compl.) ¶ 1. The district court had federal-question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).

The parties dispute whether Plaintiffs have Article III standing. On March 28, 2025, the district court held that Plaintiffs had pleaded standing. Op. 19-20.

On July 22, 2025, the court certified its decision for interlocutory appeal under 28 U.S.C. § 1292(b). *See* Dkt. 90. On August 1, 2025, Lockheed

Martin petitioned this Court for permission to appeal, *see* No. 25-180, Dkt. 2, and on September 9, 2025, the Court granted the petition, No. 25-180, Dkt. 24. This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUE

Whether a complaint plausibly pleads Article III standing to bring a claim to challenge an ERISA annuity buyout transaction, when the complaint alleges only that defendants theoretically increased the risk that plaintiffs might not receive their pension payments at some indefinite future point, without plausibly alleging that such harm is certainly impending or has a substantial risk of imminently occurring.

## STATEMENT OF THE CASE

### A.   Statutory Background

1. ERISA is the federal law that governs private-sector employee-benefit plans. *See* 29 U.S.C. § 1001. ERISA does not require employers to offer plans or provide any particular type of plan or benefit, or even to offer benefit plans in the first place. *Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996). Instead, it imposes duties on plan fiduciaries once an employer has decided to offer a benefit plan. 29 U.S.C. § 1001(b).

In particular, ERISA imposes duties of prudence and loyalty on plan fiduciaries. 29 U.S.C. § 1104(a); *see Tibble v. Edison Int'l*, 575 U.S. 523, 528

4

(2016).  The duty of prudence requires a plan fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use."  29 U.S.C. § 1104(a)(1)(B).  The duty of loyalty requires a plan fiduciary to "discharge his duties . . . solely in the interest of the participants and beneficiaries."  *Id.* § 1104(a)(1).  ERISA also prohibits fiduciaries from causing plans to engage in certain prohibited transactions with interested parties, *id.* § 1106(a), or that benefit the fiduciaries, *id.* § 1106(b).

ERISA recognizes there is a "range of reasonable judgments a fiduciary may make."  *Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022).  Further, ERISA's fiduciary duties apply only to fiduciary functions, meaning exercises of discretionary authority in managing a plan or its assets.  *See* 29 U.S.C. § 1002(21)(A).  The fiduciary duties do not apply to settlor functions, meaning decisions to establish, design, or terminate a plan (including termination through an annuity buyout transaction).  *See Beck v. PACE Int'l Union*, 551 U.S. 96, 101-02 (2007).

2.  This case concerns a defined-benefit pension plan, where beneficiaries receive a set monthly payment for the rest of their lives.  *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-40 (1999).  In contrast, in a de-

5

fined-contribution plan, participants and their employers make contributions into individual accounts, and the benefits depend on the value of those accounts at retirement. *Id.*

ERISA expressly permits an employer to transfer its pension obligations to an insurer through an annuity buyout transaction. 29 U.S.C. § 1341(b)(3)(A)(i); *see Beck*, 551 U.S. at 103. (Plaintiffs call this a "pension risk transfer" or "PRT" transaction.)

In an annuity buyout transaction, the sponsor of a defined-benefit pension plan transfers the plan's assets to the insurance company in exchange for an annuity contract that covers the plan's liabilities. *See Beck*, 551 U.S. at 99. Going forward, the insurance company is contractually responsible for paying the benefits. *See id.* at 103. Thus, an annuity buyout transaction does not involve any loss of benefits, but only shifts the entity that provides them. The decision to engage in an annuity buyout termination is a settlor function, but the choice of which insurer to use for the transaction is a fiduciary function. *Id*. at 101-02.

Annuity buyout transactions can be good for both employers and plan participants and beneficiaries. These transactions can help ensure that beneficiaries receive the benefits due, since insurance companies are experts in investing assets and managing the associated risk in order to pay

long-term annuity benefits, and plan sponsors typically are not. *See* Fiona Ng et al., *Pension Risk Transfer: Staying Current in a Rapidly Evolving Market*, Milliman (June 23, 2023), perma.cc/D5H2-BQSV.

The insurance companies are subject to rigorous regulatory requirements, including capitalization and rating requirements. Nat'l Ass'n of Ins. Comm'rs, *Pension Risk Transfer* (May 9, 2024), perma.cc/CG9R-6G5X. The assets backing the annuities typically are held in separate accounts, so the funds are unavailable to general creditors in the event of a default. *Id.* In the event the assets in the separate accounts are insufficient to cover benefit liabilities, the insurance company could draw on the additional assets in its general account. *Id.*

Further, the insurance companies often have reinsurance coverage. Nat'l Ass'n of Ins. Comm'rs, *Reinsurance* (May 9, 2024), perma.cc/5ALX-3QAJ. Finally, the annuities are backed by state guaranty associations (SGAs), which ensure a minimum level of benefits in the event of an insurer's default. *See* Nat'l Org. of Life & Health Ins. Guar. Ass'ns, *What Happens When an Insurance Company Fails*, perma.cc/2MXZ-GXVU (last visited Dec. 3, 2025).

Annuity buyout transactions are common and have proven very safe. Between 2012 and 2024, there were over 6,000 annuity buyout transactions

involving over \$369 billion in premiums.  *See* Aon, *U.S. Pension Risk Transfer Update* 3 (Feb. 2025), perma.cc/QC9S-365T.  In the last three decades, no retiree has lost a single penny in benefits as a result of an annuity buyout transaction.  ERISA Advisory Council, U.S. Dep't of Lab., *Statement of the 2023 Advisory Council on Employee Welfare and Pension Benefit Plans to the U.S. Department of Labor Regarding Interpretive Bulletin 95-1* (Aug. 29, 2023), perma.cc/4RHL-6PEF (ERISA Advisory Council Statement).

## B.    Factual Background

The following facts are drawn from Plaintiffs' complaint, as well as from the documents incorporated by reference into the complaint, and are taken as true at the motion-to-dismiss stage.  *See Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016).[1]

---

[1]  At the district court's request, Lockheed Martin submitted additional documents related to the transactions.  *See* Dkt. 65.  Those documents are notices and "welcome kits" sent to participants about the transactions, *see* Dkt. 65-1 to -4; examples of annuity certificates sent to participants, *see* Dkt. 65-5 and -6; and the group annuity contracts Lockheed Martin purchased from Athene for the transactions, *see* Dkt. 65-7 to -10.  Of these documents, only the group annuity contracts are referenced in the complaint.  *See* Compl. ¶ 58.  The court ultimately did not rely on the additional documents. *See* Op. 25-27.

This case involves two Lockheed Martin defined-benefit pension plans. Compl. ¶¶ 9-10. In 2021 and 2022, Lockheed Martin engaged in annuity buyout transactions for both plans. *Id.* ¶¶ 57-59. Athene was chosen as the insurance company that would assume responsibility for paying the benefits. *Id.* Through these transactions, Athene assumed responsibility for paying the benefits for approximately 31,600 beneficiaries. *Id.* ¶¶ 58-59. Since June 1, 2023, Athene has paid all benefits due. *Id.*

Athene is "one of the leading players" in annuity buyout transactions. Compl. ¶ 47. It has been operating for over sixteen years, and it specializes in paying long-term annuity benefits. *Id.* ¶ 46. As Plaintiffs' own expert admits, Athene has an "A+" credit rating from S&P and an A1 rating from Moody's. Dkt. 35-3 (Gober Decl.) ¶ 41; *see* Athene Life Re, *Home Page*, perma.cc/B65K-5DX6 (last visited Dec. 3, 2025) (noting that Athene also has A+ ratings from Fitch and AM Best).[2] Athene is owned by Apollo Global Management, one of the world's largest alternative asset managers. Compl. ¶¶ 46-47. Athene has completed over $50 billion in annuity buyout transactions that cover over half a million former pension plan participants. *Id.* ¶ 47.

---

[2] Both sources are cited by, and thus incorporated into, the complaint. Compl. ¶¶ 48 n.44, 50-51; *see Goines*, 822 F.3d at 166; Op. 27 n.13.

Athene provides multiple protections for beneficiaries of its group annuity obligations. The assets used to fund benefits are "ring-fenced" in a separate account, so they are insulated from Athene's general liabilities and cannot be reached by Athene's general creditors. Dkt. 65-7, at 6-7.[3] Further, Athene maintains reserves that can fully fund its annuity liabilities, *see* Gober Decl. ¶ 10; it has access to additional capital that it is required by law to maintain that it can draw on if needed, *see id.* ¶¶ 19-20; and it maintains reinsurance coverage, *see id.* ¶ 25. Finally, its annuities ultimately are backed by SGAs. *Id.* ¶ 32.

## C. Procedural History

### 1. Plaintiffs' Complaint

Plaintiffs were participants in the Lockheed Martin pension plans whose benefits obligations were transferred to Athene. Compl. ¶ 1. They allege that Lockheed Martin violated ERISA by engaging in the transactions because (in their view) Athene is not the "safest possible" insurance company in the market. *Id.* ¶ 4. They point to Athene's private-equity ownership and its use of Bermuda-based affiliated reinsurers, which they claim makes Athene riskier than other insurance companies. *Id.* ¶¶ 42-56. They

---

[3] The complaint expressly refers to and relies on the contract, *see* Compl. ¶ 58, so it is incorporated into the complaint, *Goines*, 822 F.3d at 166.

also allege that their benefits are no longer backed by the Pension Benefit Guaranty Corporation (PBGC), which guarantees a minimum level of benefits in the event of an ERISA pension plan's failure. *Id.* ¶ 30.

Plaintiffs acknowledge that Athene has paid all benefits to date and that they are contractually entitled to all future benefits. *See* Compl. ¶¶ 59, 82; Op. 8. Plaintiffs do not contend that their benefits are underfunded; in fact, they admit that Athene maintains a funding surplus. *See* Gober Decl. ¶ 10. Instead, Plaintiffs simply assert that Athene is riskier than other competitors that Plaintiffs prefer. *See* Compl. ¶ 55.

Plaintiffs allege three causes of action: (1) breach of fiduciary duty under 29 U.S.C. § 1104(a)(1)(A) and (B), on the theory that it was imprudent for Lockheed Martin to select Athene and that Lockheed Martin selected Athene out of its own interest and not the participants' interests, *see* Compl. ¶¶ 68-74[4]; (2) engaging in prohibited transactions under 29 U.S.C. § 1106, on the theory that Athene was an interested party and that the transactions benefited Lockheed Martin's own interests, *see id.* ¶¶ 75-83; and (3) failure

---

[4]  The complaint alleges that Lockheed Martin selected Athene, but that is incorrect. The documents provided to the district court show that Lockheed Martin engaged an independent fiduciary, Fiduciary Counselors, to select the annuity provider, and Fiduciary Counselors selected Athene. *See* Dkt. 65-1, at 5.

to monitor "any other fiduciaries appointed or hired to manage the plans," to the extent those fiduciaries were involved in choosing Athene as the annuity provider, *see id.* ¶¶ 84-88.

## 2. The District Court's Motion-To-Dismiss Decision

Lockheed Martin moved to dismiss the complaint for lack of subject-matter jurisdiction and for failure to state a claim. Dkt. 26. Only subject-matter jurisdiction is at issue in this appeal.

The district court denied Lockheed Martin's motion to dismiss, concluding that Plaintiffs "barely" alleged facts sufficient to "eke[] out" an injury. Op. 16-20. The court recognized that Plaintiffs had not "allege[d] any disruption in their annuity payments" and thus had failed to allege an actual injury. *Id.* at 16. But the court decided that Plaintiffs had alleged a sufficient potential future injury, because they alleged that Athene is owned by a private-equity firm and that some of its reinsurers are based in Bermuda. *Id.* at 18-20. According to the district court, those alleged facts show a "substantially increased risk" that Athene could fail in the future and that Plaintiffs would not receive their benefits. *Id.*

The district court also stated that even without an actual or imminent loss of benefits, Plaintiffs had "an alternative basis for standing in trust law" because they seek equitable remedies for breach of fiduciary duty. Op.

21-25. The court acknowledged that this theory appears inconsistent with *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), *id.* at 24 n.11, but stated that it was "constrained" to accept the theory based on *Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021), *id.* at 24 – even though *Peters* did not involve a defined-benefit plan and did not acknowledge *Thole*.

### 3. The District Court's Certification Decision

Lockheed Martin asked the district court to certify its decision for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Dkt. 83. The district court certified its order, Dkt. 90, at 7-10, and this Court granted interlocutory review, No. 25-180, Dkt. 24.

### 4. Decisions In Other Cases

Several other district courts have considered complaints challenging annuity buyout transactions. All of the lawsuits involve Athene or Prudential Insurance Company of America, another leading insurer in the annuity buyout market. No plaintiff in any of the lawsuits alleges a failure to pay benefits; the complaints all allege only a future risk of nonpayment.

To date, five other courts have issued decisions addressing whether the plaintiffs have pleaded Article III injuries. Three courts concluded that the plaintiffs "have failed to establish standing" because they "never allege that Athene is substantially likely to fail." *Camire v. Alcoa USA Corp.*,

No. 24-cv-1062, 2025 WL 947526, at *7 (D.D.C. Mar. 28, 2025).[5]  The other

two courts concluded that the plaintiffs pleaded standing,[6] although one

court then dismissed the complaint for failure to state a claim.[7]  This is the

first case to present the standing issue to a court of appeals.

## SUMMARY OF THE ARGUMENT

Plaintiffs' complaint should be dismissed for lack of standing because

they have not pleaded an Article III injury.

A.  Article III standing requires a plaintiff to plead an injury in fact.

That requirement ensures that federal courts decide only actual cases and

controversies, as opposed to hypothetical disputes that would lead to advi-

sory opinions.  Pleading an injury in fact requires allegations of an actual

injury, meaning one that already has occurred, or an imminent injury,

meaning one that is "certainly impending" or that is at "substantial risk" of

---

[5]  *See Bueno v. Gen. Elec. Co.*, No. 24-cv-822, 2025 WL 2719995, at *19 (N.D.N.Y. Sept. 24, 2025); *Schoen v. ATI, Inc.*, No. 24-cv-1109, 2025 WL 2970339, at *7 (W.D. Pa. Oct. 7, 2025) (R&R).

[6]  *See Doherty v. Bristol-Myers Squibb Co.*, No. 24-cv-6628, 2025 WL 2774406, at *5 (S.D.N.Y. Sept. 29, 2025), *certified for interlocutory review*, 2025 WL 3204436 (S.D.N.Y. Nov. 17, 2025); *Piercy v. AT&T Inc.*, No. 24-cv-10608, 2025 WL 2505660, at *14 (D. Mass. Aug. 29, 2025) (R&R), *adopted*, 2025 WL 2809008 (D. Mass. Sept. 30, 2025).

[7]  *Piercy*, 2025 WL 2505660, at *42-48.

occurring. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013); *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021).

The Supreme Court and this Court have applied the injury-in-fact requirement to ERISA cases involving defined-benefit plans. Both *Thole v. U.S. Bank N.A.*, 590 U.S. 538 (2020), and *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013), held that a plaintiff suffers an actual injury only if the plaintiff has not been paid benefits due; alleging a fiduciary breach that decreased plan assets is insufficient. Although both decisions left open the possibility that a participant in a defined-benefit plan could plead an injury based on risk of nonpayment of future benefits, they made clear that the plaintiff must plead an imminent injury; mere speculation of future nonpayment at some point in the future is insufficient.

B. The district court correctly recognized that Plaintiffs have not pleaded an actual injury. *Thole* and *David* are directly on point: A plaintiff who has received all benefits due under a defined-benefit plan has not suffered an actual injury. *Thole*, 590 U.S. at 542-43; *David*, 704 F.3d at 336-38. Plaintiffs here have received all benefits due and they remain entitled to those benefits in the future.

Plaintiffs argue that they have an actual injury because their future benefits supposedly are less valuable today. But that is merely a restatement of their future risk of harm, not an actual injury they already have incurred. That theory also is inconsistent with *Thole*, because the plaintiffs in that case had alleged underfunding, which under Plaintiffs' view would have been enough for an actual injury.

C. Plaintiffs have not pleaded an imminent injury based on the potential future nonpayment of benefits. The district court accepted this theory of standing, but it was mistaken.

For a future injury to be "certainly impending," the injury must be expected to immediately occur at a certain time; an attenuated chain of possibilities is not enough. *Clapper*, 568 U.S. at 414. For a "substantial risk" of injury, a plaintiff must plausibly allege facts showing a very high likelihood that the injury will in fact occur (and occur soon). *Murthy v. Missouri*, 603 U.S. 43, 58 (2024).

Plaintiffs have not pleaded that nonpayment is "certainly impending." Athene has an A+ credit rating and maintains a funding surplus. It specializes in paying long-term annuity benefits. Plaintiffs admit that Athene is a market leader with over half a million beneficiaries. Plaintiffs do not allege that Athene has ever missed a payment for any beneficiary.

16

Plaintiffs' claim of potential injury depends on an attenuated series of events, all of which would have to occur: (1) the assets funding their benefits would have to be insufficient; (2) Athene would have to be unable to make up the shortfall with its other assets; (3) Athene would have to be unable to raise additional capital; (4) Athene's reinsurance coverage would have to be inadequate; and (5) SGA protections would have to be insufficient. Plaintiffs have not pleaded that *any* of those is likely to occur.

Plaintiffs likewise have not pleaded a "substantial risk" of nonpayment. Notably, this Court has explained that a risk is not substantial if there is only a one-in-three chance of it occurring. *Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017). Plaintiffs allege only that Athene supposedly is riskier than other insurers, but those allegations do not show that Athene is at substantial risk of failure. Indeed, Plaintiffs admit that Athene's credit rating means that it has a less than five percent chance of default – far lower than the floor this Court has established.

The district court erred because it used the wrong legal standard. It focused only on whether Plaintiffs had alleged an increase in risk, not whether that increased risk actually was likely to cause an injury. Yet as the Supreme Court and this Court have established, the absolute risk of harm is what matters. The district court also erred in its assessment of

Plaintiffs' allegations, because the facts pleaded do not establish a substantial increase in risk of imminent injury.

D.  The district court further erred by suggesting that Plaintiffs could plead standing simply by alleging a breach of fiduciary duty and seeking equitable relief.  *Thole* expressly rejected that argument in the context of a defined-benefit plan.  The district court relied on language from *Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021), but that language was *dicta*.  *Peters* did not involve a defined-benefit plan, and *Thole* rejects the fiduciary-breach theory of standing for participants in defined-benefit plans.

E.  This lawsuit (and others like it) are direct attacks on a procedure that ERISA affirmatively allows.  ERISA expressly permits annuity buyout transaction because they have benefits for both employers and plan participants and beneficiaries.  Accepting Plaintiffs' theory of standing would upset ERISA's balance between protecting employee benefits and imposing a manageable set of liabilities on employers.  If this lawsuit could proceed, a plan beneficiary could challenge essentially any annuity buyout transaction.

Plaintiffs argue that if they are not able to bring this lawsuit, they will have no recourse if Athene becomes unable to pay benefits in the future.  But a beneficiary or the Secretary of Labor can sue under ERISA if there is

an actual or imminent loss of benefits within the first six years of the trans-action.  *See* 29 U.S.C. §§ 1113(1)(A), 1132(a)(9).  After that, beneficiaries could sue the insurer because the insurer is contractually obligated to make the benefits payments.  All the while, state insurance regulators are moni-toring the insurance companies, and they can intervene if they see a serious risk of nonpayment and require the insurer to take additional steps.  And if an insurer did become unable to fulfill its obligations, SGAs would provide a backstop to fund the benefits.

This Court should reverse.

## STANDARD OF REVIEW

The Court reviews *de novo* a denial of a motion to dismiss for lack of subject-matter jurisdiction.  *See Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 629 (4th Cir. 2018).

## ARGUMENT

### THE COMPLAINT SHOULD BE DISMISSED BECAUSE PLAIN-TIFFS HAVE NOT PLAUSIBLY PLEADED ARTICLE III STANDING

#### A.  Article III Standing Requires An Actual Or Imminent In-jury

1.  Under Article III of the U.S. Constitution, federal courts only have subject-matter jurisdiction over "cases" or "controversies."  U.S. Const. art. III, § 2, cl. 1.  An "essential and unchanging part of the case-or-controversy

requirement" is that plaintiffs must have standing to bring their cases. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). This requirement ensures that federal courts "exercise their proper function in a limited and separated government," by deciding only "real controvers[ies] with real impact on real persons," rather than issuing advisory opinions. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423-24 (2021) (internal quotation marks omitted); *see Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 208 (4th Cir. 2025).

The "irreducible constitutional minimum" of standing consists of three elements: (1) an injury in fact that is (2) fairly traceable to the defendant's action and (3) likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. These requirements "apply equally to class actions." *Holmes v. Elephant Ins.*, 156 F.4th 413, 420 (4th Cir. 2025). This case concerns the first element, injury in fact.

A plaintiff pleads a cognizable injury in fact when he or she "clearly" alleges facts "demonstrating" that he or she has suffered an injury that is "concrete and particularized" and "actual or imminent," as opposed to "conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338-39 (2016) (internal quotation marks omitted). For an injury to be concrete, it must either be a tangible injury such as a "physical" or "monetary" harm, or an

intangible harm "traditionally recognized as providing a basis for lawsuits in American courts," such as reputational harm. *TransUnion*, 594 U.S. at 425. A bare statutory violation is insufficient. *Id.* at 426.

The injury also must be "actual or imminent." An "actual" injury is a "current" injury, *John and Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 629 (4th Cir. 2023), meaning that it "must have already occurred," *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024).

In contrast, an "imminent" injury is one that has not yet occurred but "is likely to occur soon." *All. for Hippocratic Med.*, 602 U.S. at 381. To plead an imminent injury, the plaintiff must allege facts plausibly showing either that the alleged future harm is "certainly impending" or that there is a "substantial risk" that the harm imminently will occur. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 n.5 (2013)). This is a demanding standard; "allegations of *possible* future injury are not sufficient." *Clapper*, 568 U.S. at 409 (internal quotation marks omitted).

2. These standing requirements apply with full force to ERISA cases. Put simply, "[t]here is no ERISA exception to Article III." *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 547 (2020).

The Supreme Court and this Court have applied these standing principles to ERISA claims involving defined-benefit pension plans, in *Thole* and in *David v. Alphin*, 704 F.3d 327 (4th Cir. 2013). Those decisions hold that a participant in a defined-benefit plan lacks an actual injury if all benefits have been paid and the participant remains "legally entitled" to those benefits in the future. *Thole*, 590 U.S. at 547; *see David*, 704 F.3d at 336-37. Those decisions also establish that a theory based on a risk of future nonpayment requires very clear plausible allegations of imminent nonpayment. *See Thole*, 590 U.S. at 546; *David*, 704 F.3d at 338.

In *Thole*, the plaintiffs alleged that their employer had violated ERISA's fiduciary duties by investing plan assets unwisely, causing the plan to lose \$750 million. 590 U.S. at 541. The Supreme Court held that the plaintiffs had not alleged an actual injury because they had "received all of their monthly pension benefits so far" and they remained "legally entitled to receive the same monthly payments for the rest of their lives." *Id.* at 542, 547. The Court explained that in a defined-benefit plan, participants' benefits are "fixed" and do not depend on the plan's performance; if the plan is underfunded, the employer is responsible for making up the shortfall. *Id.* at 542-43. Accordingly, so long as Plaintiffs receive and remain entitled to receive their benefits, they are not harmed. *Id.* The Court

22

considered, and rejected, the argument that participants can plead an actual injury merely by pleading a breach of fiduciary duty, explaining that participants have no separate interest in the plan assets and thus are not harmed by a decrease in those assets. *Id*.; *see* pp. 48-49, *infra*.

The *Thole* Court then discussed an argument raised by some *amici*, that a plaintiff could have standing if a defined-benefit plan were mismanaged so "egregious[ly]" as to "substantially increase[] the risk" of nonpayment of benefits. 590 U.S. at 546. The Court did not decide whether that theory of standing is viable, because the plaintiffs did not plead it. *Id*. (noting that plaintiffs had not "plausibly and clearly" alleged facts showing that "the plan and the employer would fail and be unable to pay the plaintiffs' future pension benefits"). The Court acknowledged that the plaintiffs had alleged plan underfunding, but held that a "bare allegation of underfunding" does not demonstrate a substantial risk of nonpayment. *Id*. at 546 & n.2.

This Court made the same points in *David*. The plaintiffs were participants in a defined-benefit plan who alleged that the sponsor violated ERISA by investing the plan's assets in underperforming mutual funds. 704 F.3d at 331. Foreshadowing the decision in *Thole*, the Court held that the plaintiffs had not alleged an actual injury because they had received all of

their benefits and remained entitled to receive those benefits.  *Id.* at 336-38.

The *David* Court also held that plaintiffs had not pleaded standing based on the "increased [] risk that the Plan would fail and that their retirement benefits would be compromised."  704 F.3d at 336-37.  That "risk-based theor[y] of standing," the Court explained, was insufficient because it "rest[ed] on a highly speculative foundation lacking any discernible limiting principle."  *Id.* at 338.  The Court declined to decide whether a plaintiff could plead standing based on allegations that a defined-benefit plan "will terminate in an underfunded state" and that a government backstop "will not pay full benefits," because the plaintiffs had not sufficiently made those allegations.  *Id.*

*Thole* and *David* thus make clear that the bar for pleading standing in a defined-benefits case is demanding, particularly if the plaintiff has received all benefits due and argues only a risk of future nonpayment.

## B. Plaintiffs Have Not Pleaded An Actual Injury

1. As the district court recognized, Plaintiffs have not pleaded an actual injury because they have received all of the benefits due to date and they are contractually entitled to receive those benefits in the future.  Op. 15-16.  *Thole* and *David* are on point.  Both establish that there is no actual

24

injury here: Beneficiaries of defined-benefit pension plans who have "received all of their monthly pension benefits so far" and remained "legally entitled to receive the same monthly payments for the rest of their lives" have not suffered an actual injury. *Thole*, 590 U.S. at 542, 547; *see David*, 704 F.3d at 336-38. That is because the beneficiaries have an interest only in their future payments, and not the underlying plan assets; if the plan ever is underfunded, the employer must make up the shortfall, whereas if the plan has a surplus, the surplus is distributed to the employer. *Thole*, 590 U.S. at 542-43.

Plaintiffs acknowledge that since Athene took over paying their benefits more than two years ago, they have received every penny of benefits due. Op. 8. In fact, Plaintiffs do not allege that Athene has ever paid *any* beneficiary of a group annuity contract less than the full amount of benefits due.

Further, Plaintiffs acknowledge that they remain "legally entitled to receive the same monthly payments for the rest of their lives." *Thole*, 590 U.S. at 547. As *Thole* and *David* establish, it would not be enough to allege that the plan funds have decreased. *Id.* at 546; *David*, 704 F.3d at 336. That is because Plaintiffs have no separate interest in any of the underlying assets that fund their benefits payments, either before or after the annuity

buyout transactions. If the group annuity contracts become underfunded, Athene will be required to establish additional reserves. *See David*, 704 F.3d at 338. And if there is any surplus, that surplus would revert to Athene and would not be distributed to Plaintiffs. *See id.*

The bottom line is that, as in *Thole* and *David*, "[w]inning or losing" this suit "would not change the plaintiffs' monthly pension benefits," so Plaintiffs lack an actual injury. *Thole*, 590 U.S. at 547.

2. Plaintiffs argued that they have alleged an actual injury because the "present value" of their pension benefits has been degraded by the choice of Athene as the insurer. Dkt. 35, at 7-9. The district court correctly rejected that theory as well. Op. 15-16 n.8.

First, Plaintiffs' present-value theory merely is a restatement of their alleged risk of future harm. Their argument is that their future benefits are worth less now because of Athene's supposed risk. That "is essentially identical to [the] argument related to a substantial risk of future injury." *Bueno v. Gen. Elec. Co.*, No. 24-cv-822, 2025 WL 2719995, at *11 n.2 (N.D.N.Y. Sept. 24, 2025). That is, Plaintiffs allege only that there is some unquantified risk that they will not receive their benefits in the future; they do not allege that the annuity buyout transactions "resulted in them being entitled to or receiving any lesser amount." *Id.* at *11. To the contrary,

Plaintiffs remain legally entitled to their full benefits for the rest of their lives.

Plaintiffs' theory impermissibly collapses the distinction between present and future injury. Any risk of future nonpayment, however slight, could be reframed as a decrease in the present value of the payment, because the "present value" of a future payment would reflect the "risk of nonpayment." *Till v. SCS Credit Corp.*, 541 U.S. 465, 483 (2004). So under Plaintiffs' theory, any time a plaintiff who is owed a future payment alleges a risk of nonpayment, that would be enough to plead a past, actual harm – even though, if the risk does not materialize, no actual harm will have occurred. That "makes no sense, except as a creative way to end-run the Supreme Court's standing precedents" on future injury, *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1298 (D.C. Cir. 2007) (Kavanaugh, J.), by eliminating the requirement that the risk of nonpayment be certainly impending or substantial, *see Bueno*, 2025 WL 2719995, at *11 n.2.

Second, as the district court explained, Plaintiffs' present-value theory is inconsistent with *Thole*. *See* Op. 15-16 n.8. The plaintiffs in *Thole* alleged that their employer's mismanagement of their pension plan had caused a decrease in the value of their plan's assets, resulting in underfunding of the plan. 590 U.S. at 540-41. Under Plaintiffs' theory,

27

those allegations of underfunding should have been enough for standing, because any underfunding would have increased the risk of future nonpayment and thus decreased the present value of their future pension benefits. Yet the Supreme Court squarely held that the *Thole* plaintiffs had not suffered an actual harm. *Id.* at 543.

Third, even if Plaintiffs' present-value theory potentially could make sense in other contexts, it does not make sense in the context of an ERISA defined-benefit plan. That is because beneficiaries have no separate interest in plan assets and cannot sell their pension benefits. In effect, Plaintiffs' theory seeks to treat Plaintiffs as "investor[s]," Compl. ¶ 7, and their pension benefits as individualized property (like a "bond"), the value of which can be reduced due to risk of future nonpayment, Gober Decl. ¶ 42. But ERISA expressly provides that benefits cannot be "assigned or alienated," 29 U.S.C. § 1056(d)(1), and that prohibition "continue[s] to govern" when a plan is terminated, *Smith v. Mirman*, 749 F.2d 181, 181 (4th Cir. 1984). Plaintiffs thus have no ability to actualize any "present value" of their benefits – and they do not allege they have attempted to do so. Because they cannot sell their benefits, Plaintiffs would suffer harm only if a benefit payment was not made. That is a potential future harm, not an actual one.

For all of those reasons, Plaintiffs have not pleaded an actual harm.

## C.     Plaintiffs Have Not Pleaded An Imminent Injury

Plaintiffs also have not pleaded any imminent future injury. They assert an unquantified risk that Athene will not pay all their benefits at some indefinite time in the future. As the Supreme Court made clear in *Thole* and this Court made clear in *David*, a theory of standing based on a risk of nonpayment requires clear and plausible allegations that the insurer will imminently fail to pay benefits. *See Thole*, 590 U.S. at 546; *David*, 704 F.3d at 338. Plaintiffs do not make those allegations here.

The district court held that Plaintiffs had "barely" pleaded an imminent injury based on the risk of future nonpayment. Op. 19. But it erred because it focused only on whether Athene allegedly is riskier than other insurers, and not whether nonpayment is "certainly impending" or whether there is a "substantial risk" of imminent nonpayment, as the Supreme Court's precedents require.[8]

---

[8]    The Supreme Court has treated the "certainly impending" and "substantial risk" inquiries as separate inquiries in some decisions, but "treat[ed] the two as one" in others. *Holmes*, 156 F.4th at 429 n.19 (comparing *Driehaus*, 573 U.S. at 158, and *Clapper*, 568 U.S. at 414 n.5, with *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). For the avoidance of doubt, this brief addresses each standard separately.

The complaint in this case has the same fundamental problems as the complaint in *David*. Both allege a risk of future nonpayment of benefits; the alleged risk in *David* was due to mismanagement of plan assets, *see* 704 F.3d at 331, and the alleged risk here is due to transfer of pension obligations to Athene, *see* Compl. ¶ 7. In both cases, the plaintiffs alleged an "increased [] risk" that they would not receive their benefits, without explaining when that risk would materialize or whether it even was likely to materialize. 704 F.3d at 336-37. And in both cases, any potential future injury only would occur after "a highly speculative" chain of events. *Id.* at 338. The district court believed that *David* is distinguishable, Op. 20, but as explained below, that is incorrect; *David* strongly supports reversal here.

### 1. Plaintiffs Have Not Alleged Facts Showing That Nonpayment Is Certainly Impending

For an injury to be "certainly impending," the injury must be expected to immediately occur. *Lujan*, 504 U.S. at 564 n.2 (requiring "a high degree of immediacy"). The plaintiffs must specify exactly "*when*" the injury will occur; speculation that an injury might occur "at some indefinite future time" does not suffice. *Id.* at 564 & n.2. The claimed harm cannot depend on "a highly attenuated chain of possibilities," without a showing that each step in the chain is imminently likely to occur. *John and Jane*, 78 F.4th at 629 (internal quotation marks omitted); *see, e.g.*, *Holmes*, 156 F.4th at 431-

32 (no injury where "plaintiffs offer only a speculative chain of possibilities" (internal quotation marks omitted)); *O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 245 (4th Cir. 2023) (no injury where claimed harm depends on a "daisy chain of speculation").

This Court's recent decision in *Beck* illustrates the stringency of the "certainly impending" standard. The plaintiffs had their medical records exposed when a thief stole a laptop containing those records from the Department of Veterans Affairs. 848 F.3d at 268. They sued the agency under the Privacy Act, 5 U.S.C. § 552a *et seq.*, alleging an increased risk of identity theft. *Id.*

The Court held that the asserted risk of identity theft was "too speculative" for standing because there was no indication of when, if ever, any identity theft would occur. *Beck*, 848 F.3d at 274. The Court observed that it had been several years since the theft, yet there was no allegation that anyone had tried to misuse the plaintiffs' information. *Id.* Further, any identity theft lay at the end of an "attenuated chain of possibilities." *Id.* at 275 (quoting *Clapper*, 568 U.S. at 410). The thief would have to recognize that the laptop contains personal information and seek to misuse it; the thief would have to select the plaintiffs' information from among the thou-

sands of individuals affected; and the thief would have to "attempt successfully to use that information to steal their identities." *Id.* This chain of contingencies, the Court held, was too "attenuated" to be certainly impending. *Id.* (internal quotation marks omitted).

As in *Beck*, Plaintiffs here fall far short of showing that nonpayment is "certainly impending." As Plaintiffs acknowledge, Athene has paid all benefits due to all beneficiaries in these plans for several years. Compl. ¶ 47. Plaintiffs also acknowledge that Athene has an A+ credit rating, Gober Decl. ¶ 41, has reinsurance coverage, *id.* ¶ 8, and is subject to stringent regulatory oversight by its state regulators, Compl. ¶ 30. They further acknowledge that if Athene were to be unable to make payments, SGAs will provide coverage up to applicable coverage limits – in most States, $250,000 in present value of annuity benefits. *Id.* ¶ 32.

Plaintiffs do not allege that Athene has exhibited any signs of financial distress in the over four years since the first challenged transaction, in the two-and-a-half years since Athene began paying their benefits, or in the year-plus that this case has been pending. As in *Beck*, the fact that the alleged injury has not come to pass in several years confirms that the injury is not "certainly impending." 848 F.3d at 274; *see Holland v. Consol Energy, Inc.*, 781 F. App'x 209, 212 (4th Cir. 2019) (unpublished) (alleged injury was

32

not certainly impending when it had not occurred "in the two years since the changes [at issue] went into effect").

Plaintiffs' theory of injury rests on a highly attenuated chain of contingencies – one that is more attenuated than the one the Court rejected in *Beck*. For Plaintiffs to actually receive less than their full benefits, at least five events must occur, none of which Plaintiffs allege is imminent:

- First, Athene would have to exhaust the assets that Lockheed Martin transferred to it (and the proceeds from investing those assets). Plaintiffs do not allege that those assets are inadequate to fund their benefits; on the contrary, they acknowledge that Athene maintains a funding surplus. Op. 19.

- Second, Athene would have to exhaust all of its other general assets. Plaintiffs do not allege that Athene as a whole is at significant risk of failure. Although they criticize Athene's private-equity ownership, they do not allege that any private-equity-owned insurer has ever actually failed. *See* Compl. ¶¶ 42-56.

- Third, Athene would have to be unable to raise additional funds on credit markets. Plaintiffs do not address this contingency at all.

- Fourth, Athene's reinsurance protections would have to be inadequate. Plaintiffs do not allege that Athene's reinsurance protections would be inadequate. They criticize Athene's use of Bermuda-based reinsurers, *see* Compl. ¶¶ 42-56, but do not allege that Athene's reinsurance protections would be insufficient here.

- Fifth, the SGAs would have to be unable to meet the shortfall in Athene's obligations. Plaintiffs assert that SGAs are not as protective as the PBGC, Compl. ¶ 32, but do not allege that SGA protections would be inadequate to cover any losses. *See Camire v. Alcoa USA Corp.*, No. 24-cv-1062, 2025 WL 947526, at *7 n.8 (D.D.C.

Mar. 28, 2025) (because the plaintiffs had "not made any allegations regarding the total value of their benefits," the court could not "determine whether the SGA is likely to cover them in their entirety in the event of Athene's failure").

The bottom line is that Plaintiffs do not plausibly plead facts showing that any one of these contingencies imminently will occur, let alone that *all* of them will. As the court in *Camire* explained when evaluating materially similar allegations, this "highly attenuated chain of possibilities" renders Plaintiffs' claim "too speculative for Article III purposes." 2025 WL 947526, at \*7 (quoting *Clapper*, 568 U.S. at 409, 410).

### 2. Plaintiffs Have Not Alleged Facts Showing A Substantial Risk Of Imminent Nonpayment

For there to be a "substantial risk" of injury, a plaintiff must plausibly allege facts showing a "real and immediate" likelihood that the injury will occur. *Murthy*, 604 U.S. at 58 (internal quotation marks omitted). Allegations that the injury "might" occur are insufficient, *John and Jane*, 78 F.4th at 630 (internal quotation marks omitted), as are allegations of an "objectively reasonable likelihood" that the injury will occur, *Beck*, 848 F.3d at 272 (quoting *Clapper*, 568 U.S. at 410). Further, as *Thole* explained, an allegation of underfunding of a defined-benefit plan is insufficient to show a substantial risk of nonpayment – the plaintiff must instead plead facts showing a real and imminent risk of plan failure. 590 U.S. at 546.

This Court illustrated what it means for a risk to be "substantial" in *Beck*. *See* 848 F.3d at 276. As noted, the plaintiffs' standing theory was that they faced a heightened risk of identity theft because a laptop containing their medical records had been stolen. *Id.* at 272. To show that the risk was "substantial," they alleged that thirty-three percent of people whose private information is stolen become victims of identity theft. *Id.* at 276. The Court held that this assertion, even if credited, "falls far short of establishing a 'substantial risk' of harm," because it meant that over sixty-six percent of victims "will suffer no harm." *Id.* *Beck* thus establishes "that the probability needed for 'substantial risk' is at least 33% – and presumably a good bit higher." *Holmes*, 156 F.4th at 430.

Plaintiffs have not shown that the risk of nonpayment here is "substantial." Plaintiffs recognize that Athene is a leader in annuity buyout transactions – it has been in business for over a decade and a half and has been involved in over $50 billion in annuity buyout transactions, covering over half a million former pension plan participants. Compl. ¶ 47. Plaintiffs do not allege that Athene has ever failed to pay any beneficiary. Plaintiffs also do not allege that their benefits are underfunded. On the contrary, Plaintiffs acknowledge that Athene maintains a funding surplus. *See* Op. 19. Further, the assets for Athene's group annuity contracts are held in a

ring-fenced, separate account at Athene, meaning that they are protected from Athene's general creditors, and Athene has a contractual obligation to ensure that the separate account is adequately funded. Dkt. 65-7, at 6-7. So Plaintiffs have done even less than the plaintiffs in *Thole*, who had alleged that their plan had been underfunded (and that allegation was insufficient for standing). 590 U.S. at 546. Indeed, Plaintiffs are just like the plaintiffs in *David*, who relied solely on speculation about future harm. 704 F.3d at 338.

Instead, Plaintiffs' allegations all focus on how Athene is supposedly riskier than other insurers, principally because of its private-equity ownership and use of Bermuda-based reinsurers. *See* Compl. ¶¶ 42-56. Those allegations are insufficient because they do not show that "Athene is substantially likely to fail – just that it is at a greater risk of failure than its competitors." *Camire*, 2025 WL 947526, at *7. That is, "the mere fact that Athene is perhaps more risky than other provider[s] does not suffice to show that there is a *substantial* risk that Athene will fail." *Bueno*, 2025 WL 2719995, at *16.

If anything, Plaintiffs' allegations affirmatively establish that the risk of nonpayment is *not* substantial. Specifically, Plaintiffs admit that Athene has an A+ credit rating from major ratings agencies. Gober Decl. ¶ 41. As

Plaintiffs acknowledge, an A rating (which is lower than Athene's) represents a five percent chance of default over twenty years. *Id*. This probability is over six times *lower* than the probability of injury alleged in *Beck*, which the Court held fell "far short" of substantial. 848 F.3d at 276.[9] As one district court explained, it is difficult, if not impossible, to "reconcil[e] a major credit rating agency's finding that Athene has a five-percent risk of default over a twenty-year period," with a conclusion that Athene "poses a substantial risk of default" that would "prevent Plaintiffs from receiving their annuity payments." *Bueno*, 2025 WL 2719995, at *18. And Plaintiffs do not account for the other things that would have to happen before their benefits would be in jeopardy – most notably, they do not plead that state SGA coverage would be inadequate. *See Camire*, 2025 WL 947526, at *7 n.8.

### 3. The District Court Erred In Concluding That Plaintiffs Had Pleaded An Injury Sufficient For Standing

The district court concluded that Plaintiffs "barely" "eked out" an Article III injury because Plaintiffs had alleged facts showing that Lockheed

---

[9] This Court has observed, without deciding, that *Beck*'s "statistical floor" "*might*" not apply outside the data-breach context. *Holmes*, 156 F.4th at 430 n.20. But even if the probability for a "substantial" injury could be lower in other contexts, there is no indication that a five percent chance of default over twenty years could be enough.

Martin had "substantially increased the risk" that they would not receive their future benefits.  Op. 16-20.  The court reached this conclusion *sua sponte*; Plaintiffs did not make any argument about a future risk of injury. They argued only that they had pleaded an *actual* injury based on the supposed decrease in future value of their benefits.  Dkt. 35, at 7-9.

The district court erred in two ways.  First, it applied the wrong legal standard by considering only the comparative risk of nonpayment, without considering the absolute risk of nonpayment.  Second, the court's analysis of Athene's relative risk is incorrect.

### a. Standing Requires A Substantial Absolute Risk Of Harm, Not Merely Any Increased Risk

The district court's focus on whether Plaintiffs showed a "substantial[] increase" in risk is incorrect as matter of law, because the standing inquiry looks to the *absolute* risk of injury, and not just to the *increase* in risk.  *See Bueno*, 2025 WL 2719995, at *15 n.7 (the "core requirement" of imminent injury is that "a substantial risk of harm actually exists" (emphasis omitted)).  To illustrate the distinction, consider a gambler who usually buys a lottery ticket for each drawing.  If one day the gambler decides to buy two tickets, the gambler has substantially increased (doubled) the "risk" of winning.  But the absolute "risk" of winning remains insubstantial, and thus

insufficient for standing. *See Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 894 (3d Cir. 2020).

1. The Supreme Court made clear that a substantial absolute risk is required in *TransUnion*. The plaintiffs in that case had been incorrectly designated as potential terrorists in their credit files, but only some of the plaintiffs' files had been disseminated to third parties. 594 U.S. at 419-20. The Court held that the plaintiffs whose designations had been disseminated had alleged reputational injury, and thus had standing. *Id.* at 432. But the Court held that those whose designations had not yet been disseminated did not have standing, because they had failed to show "a sufficient risk of future harm." *Id.* at 437-38.

*TransUnion* forecloses the district court's increased-risk theory. Under the district court's theory, the plaintiffs in *TransUnion* would have had standing, because the incorrect designations in their credit reports substantially increased the risk that they would suffer reputational harm. *See* 594 U.S. at 432. Indeed, those designations could have been disseminated to others "at any moment" – it had already happened to the other plaintiffs. *Id.* at 438. But the Court rejected that argument; the Court explained that

39

the plaintiffs needed to show a "serious likelihood" that the incorrect designations would be released to third parties. *Id.* (internal quotation marks omitted). That is, they needed to show a substantial *absolute* risk of injury.

Decisions from this Court all make the same point. For example, this Court in *Beck* accepted as true the plaintiffs' allegation that data-breach victims are "9.5 times" more likely to suffer identity theft than those whose personal information has not been exposed. 848 F.3d at 276. But that significant increase in risk was not sufficient for standing, because the plaintiffs had alleged only a thirty-three percent absolute risk of identity theft. *Id.*

Similarly, in *Holmes*, the Court held that plaintiffs who alleged that their driver's license numbers had been stolen lacked standing. 156 F.4th at 428. Some plaintiffs argued that they faced an increased risk of identity theft, even though their numbers had not yet been sold on the dark web, because other plaintiffs' numbers had been sold. *Id.* The Court explained that this theory of standing "runs headlong into *TransUnion*," because, as in *TransUnion*, the plaintiffs "had given no reason to think" their numbers would in fact be sold. *Id.* at 429. They thus had not shown "a substantial risk of future misuse" of their license numbers. *Id.*

*Beck* and *Holmes* are consistent with decisions from other circuits.[10] These decisions establish that a plaintiff alleging standing based on a risk of future harm must show that there is a substantial absolute risk that the harm will occur – not merely an increase in that risk.

2. The district court relied on *Thole* for its increased-risk theory, but that reliance is misplaced.

As explained, after holding that the plaintiffs had not pleaded an actual injury, the *Thole* Court then noted that some *amici* had suggested a standing argument based on a risk of future injury. *See* 590 U.S. at 542-46. The *amici* argued that "plan participants in a defined-benefit plan have standing to sue if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail

---

10 *See, e.g.*, *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1343 (11th Cir. 2021) (holding that "allegations of 'increased risk' are insufficient to confer standing" when the absolute risk alleged is "low"); *Thorne*, 980 F.3d at 894 (explaining that the "relative increase cannot be the measuring stick," because the absolute risk still could be "miniscule" (internal quotation marks omitted)); *Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249, 1255 (D.C. Cir. 2018) ("Our precedents on probabilistic standing require at least *both* (i) a *substantially* increased risk of harm and (ii) a *substantial* probability of harm with that increase taken into account." (internal quotation marks omitted)); *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 546 (5th Cir. 2016) (no standing where complaint alleged actions that "merely increase[d] the relative likelihood" of harm but did not "create a likelihood of direct injury").

and be unable to pay the participants' future pension benefits." *Id.* The Court did not decide if that theory is valid because the plaintiffs had not alleged it – the most that the plaintiffs had alleged was plan underfunding, and "a bare allegation of plan underfunding does not itself demonstrate a substantially increased risk that the plan and the employer would both fail." *Id.*

The district court relied on *Thole*'s "substantially increased the risk" language to hold that an increased risk is enough for standing, even if there is no substantial likelihood that the risk will occur. Op. 16 (quoting 590 U.S. at 546). But the *Thole* Court merely was describing the *amici*'s theory; the Court did not affirmatively hold that the theory is "a correct statement of the law." *Bueno*, 2025 WL 2719995, at *15. And *Thole* cited prior decisions where the courts had applied the settled "substantial risk" standard, which requires showing a substantial absolute risk of imminent harm. *See* 590 U.S. at 546 (citing *Clapper*, 568 U.S. at 414 n.5; *Lee*, 837 F.3d at 545-46; *David*, 704 F.3d at 336-38). Further, following *Thole*, the Supreme Court decided *TransUnion*, which confirmed that there must be a substantial absolute risk of future harm, not merely a substantial increase. *See* 594 U.S. at 438; pp. 39-40, *supra*. The district court's theory of standing thus is contrary to the Supreme Court's precedents on this point.

3. The district court also cited *David* as supporting its holding, but that reliance was misplaced.

As explained, in *David*, this Court held that the plaintiffs' allegation that they faced a risk of nonpayment of future benefits was too speculative to constitute a cognizable injury. 704 F.3d at 336-38. The district court noted that *David* reserved the question whether a plaintiff could establish Article III standing by plausibly alleging that a pension plan "will terminate in an underfunded state" and the shortfall would not be covered by a government backstop. Op. 20 (quoting *David*, 704 F.3d at 338). The court decided that Plaintiffs here had made those allegations. *Id.*

The district court is mistaken. Plaintiffs do not plead that their benefits are or will be underfunded or that SGA coverage would be inadequate if Athene were to fail. Instead, they acknowledge that Athene maintains a funding surplus. Op. 19. The district court pointed to Plaintiffs' allegations about Athene's relative risk, *see id.* at 20, but as explained, those allegations do not show that Athene will fail, let alone that it will do so imminently, *see* pp. 34-36, *supra.*

Plaintiffs thus fall squarely within the category of plaintiffs for which *David* foreclosed standing – those who merely allege that their "pension benefits will at some point in the future be adversely affected as a result of

43

the present alleged ERISA violations." 704 F.3d at 338. This Court held that those plaintiffs' injuries are "too speculative to give rise to Article III standing," and it should do so again here. *Id.*

### b. The District Court Erred In Its Assessment Of The Supposed Increased Risk

Even if the district court's increased-risk theory were valid, the court erred in its assessment of the risk. Although the complaint asserts that the transactions with Athene increased the risk of nonpayment, the facts pleaded do not show a *substantial* increase in that risk.

The district court first cited the complaint's allegation that a different insurer (Executive Life) collapsed in 1992. Op. 17-18. But the complaint does not allege that Athene is situated similarly to Executive Life; for example, the complaint does not say whether Executive Life had reinsurance coverage. *See* Compl. ¶¶ 33-38. On the contrary, the complaint makes clear that Executive Life was *not* similarly situated to Athene. The complaint acknowledges that Executive Life had a B- credit rating when it collapsed, compared to Athene's A+ rating now. *Id.* ¶ 38. If one experience from over 30 years ago, involving a different insurer, were sufficient to show a substantial increase in risk, then any plaintiff would have standing to challenge any annuity buyout transaction since 1992.

The district court next cited the complaint's allegations about Athene's private-equity ownership. Op. 18-19. But the complaint does not allege that insurers with private-equity ties have failed at greater rates than other insurers. *See* Compl. ¶¶ 42-56. Indeed, the complaint does not cite a single example of any private-equity-owned insurer that has failed, much less an insurer that was "of a similar type and structure to Athene." *Bueno*, 2025 WL 2719995, at *17.

Notably, the Department of Labor, which oversees all ERISA plans, is well aware of annuity buyout transactions involving insurers that are owned by private-equity firms, and it has not suggested that those transactions are problematic. In 1995, the Department issued non-binding guidance for employers on how to select an insurer. *See* 29 C.F.R. § 2509.95-1. Last year, at Congress's request, the Department issued a report on whether it should revise that guidance. *See* Emp. Benefits Sec. Admin., U.S. Dep't of Lab., *Department of Labor Report to Congress on Employee Benefits Security Administration's Interpretive Bulletin 95-1* (2024), perma.cc/K72D-YY8C (EBSA Report). The report extensively discussed the involvement of private-equity-backed insurers in annuity buyout transactions, *id.* at 11-13, and did not recommend that the Department change its guidance, *id.* at 27. Private-equity ownership thus does not show a substantial increase in risk.

The district court also cited the complaint's allegations about Athene's use of affiliated reinsurers based in Bermuda. Op. 19. But the complaint does not allege that Plaintiffs' preferred alternative insurers do not also use affiliated reinsurers based in Bermuda. *See* Compl. ¶¶ 48, 52. Indeed, Prudential (one of Plaintiffs' preferred alternatives, *see id.* ¶ 62) also uses affiliated reinsurers based in Bermuda. Prudential Fin., Inc., *Annual Report (Form 10-K)* 2 (Feb. 13, 2025); *see KBC Asset Mgmt. NV v. DXC Tech. Co.*, 19 F.4th 601, 607 (4th Cir. 2021) ("We may also take judicial notice of the content of relevant Securities and Exchange Commission [] filings.").

The Department of Labor also expressly considered Bermuda-based reinsurance and did not suggest any changes to existing guidance. EBSA Report 17-18, 27. That is because Bermuda "is well recognized as a credentialed international reinsurance jurisdiction" – in fact, it is "the leading jurisdiction for international reinsurance and one of the few jurisdictions recognized by both the European Union and the U.S. for the comprehensiveness and quality of its regulation." *Id.* Bermuda-based reinsurance thus does not show a substantial increase in risk.

Finally, the district court noted Plaintiffs' allegations that their benefits are no longer overseen by the Department of Labor and guaranteed by the PBGC, but rather are overseen by state regulators and guaranteed by

SGAs, which Plaintiffs allege is less protective than federal regulation. Op. 17, 19-20. This allegation is doubtful, given that state regulatory oversight and SGA protections are robust. *See* ERISA Advisory Council Statement. But more importantly, these allegations do not distinguish Athene from other insurers. The consequence of every annuity buyout transaction is that oversight shifts from the federal government to the States. *See Beck v. PACE Int'l Union*, 551 U.S. 96, 106 (2007).

The district court erred in concluding that Plaintiffs' factual allegations plausibly show a substantially increased risk of harm from the Athene transactions.

## D.  Seeking Equitable Relief For Breach Of Fiduciary Duty Is Not Enough To Confer Standing

In the alternative, the district court suggested that Plaintiffs have standing because they have alleged breaches of fiduciary duty and are seeking equitable relief. Op. 21-25. It is not clear whether the court viewed this as an independent basis for standing; at one point, the court stated that the allegations of breaches "gave rise to standing *when coupled with* allegations related to Athene's alleged instability and potential risk of failure." *Id.* at 24 (emphasis added). But to the extent that the court held that an allegation of breach standing alone was enough for standing, it is mistaken.

The district court relied on *Peters v. Aetna Inc.*, 2 F.4th 199 (4th Cir. 2021). Op. 21-24. But *Peters* did not address the issue here, and *Thole* makes clear that in the context of defined-benefit plans, a breach of fiduciary duty alone is insufficient for standing.

### 1. *Thole* Squarely Forecloses This Theory Of Standing

*Thole* held that an allegation of a breach of fiduciary duty is insufficient to establish Article III standing for a participant in a defined-benefit plan. 590 U.S. at 542. The Supreme Court could not have been clearer on this point: It expressly rejected the argument that "a plan fiduciary's breach of a trust-law duty of prudence or duty of loyalty itself harms ERISA defined-benefit plan participants" when "the participants themselves have not suffered (and will not suffer) any monetary losses." *Id.*

The Court acknowledged that under trust law, a breach of fiduciary duty may suffice for standing because the beneficiaries of a trust usually have an interest in the plan's assets, and thus they are harmed if a fiduciary breach causes a decrease in assets. *See* 590 U.S. at 542. But the Court explained why that reasoning does not apply to ERISA defined-benefit plans. *Id.* Unlike the beneficiaries of traditional trusts, the beneficiaries of defined-benefit plans do not have any "equitable or property interest" in the plans. *Id.* Beneficiaries are entitled to a set amount of benefits, regardless

of the value of the plan assets. *Id.* at 542-43. Thus, trust law's fiduciary-breach theory of standing has no application to defined-benefit plans. *Id.* at 543.

*Thole*'s holding applies directly to this case. As in *Thole*, Plaintiffs allege fiduciary breaches in the management of defined-benefit plans. *See* Compl. ¶¶ 9-10. Yet as *Thole* explains, Plaintiffs have no separate interest in the plans' assets; their interest only is in the benefits they have received and are entitled to continue receiving. 590 U.S. at 542.

The district court appeared to believe that *Thole*'s holding applies only to a theory of actual harm and not to a theory of increased risk of harm. *See* Op. 24 n.11 (stating that Plaintiffs' allegations are "sufficiently distinguishable" from those in *Thole*). That is incorrect: *Thole* rejected trust-law analogies because of the *nature* of defined-benefit plans, which does not change based on the theory of standing. *See* 590 U.S. at 542-43.

### 2. The District Court's Reliance On *Peters* Is Misplaced

The district court believed that despite *Thole*, it was "constrained" to accept Plaintiffs' fiduciary-breach theory of standing by *Peters*. Op. 24. In *Peters*, this Court suggested, in the context of a healthcare plan, that an allegation of fiduciary breach could be sufficient to plead standing to seek equitable relief. *See* 2 F.4th at 220-21. But the language the court cited

49

was *dicta*, and it addressed a fundamentally different situation than the one here. Whatever its merits in the context of healthcare plans, the *Peters dicta* should not be extended to defined-benefit plans.

*Peters* involved a self-funded healthcare plan where the plaintiff alleged that the plan's administrator, Aetna, breached its fiduciary obligations by bundling rates for subcontracted services, such that participants paid administrative fees that were supposed to be Aetna's responsibility. 2 F.4th at 212-13. The Court held that the plaintiff had Article III standing because she had shown an actual financial injury, as she allegedly had paid fees she should not have been charged in the first place. *Id.* at 218-19.

Then, in *dicta*, the Court suggested that the plaintiff also could establish standing because she sought equitable relief for Aetna's alleged breach of fiduciary duty. 2 F.4th at 220-21. Relying exclusively on pre-*Thole* case law, the Court took the view that under trust-law principles, a plaintiff seeking equitable relief may "allege only violation of the fiduciary duty owed to them as a participant in and beneficiary of" an ERISA plan and "need not demonstrate individualized injury." *Id.* (internal quotation marks omitted).

The district court erred in relying on *Peters*. To begin with, this discussion was *dicta*, because the Court had already held that the plaintiff *had* established an actual financial injury and had standing on that basis.

2 F.4th at 218-19. The district court said it would not disregard this part of the decision because of its length. Op. 23. But *dicta* is *dicta*, no matter how long. *See City of Martinsville v. Express Scripts, Inc.*, 128 F.4th 265, 271 n.5 (4th Cir. 2025).

In any event, *Thole* rejects the *Peters* theory for defined-benefit plans. *Peters* expressly relied on trust-law principles, *see* 2 F.4th at 220-21, but the Supreme Court explained in *Thole* that trust-law principles should not be used to determine standing in cases involving defined-benefit plans because those plans are not comparable to traditional trusts, *see* 590 U.S. at 542-43. *Peters* does not mention *Thole*, much less attempt to explain how it is consistent with that decision – and it is not. *See, e.g.*, *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 528-29 (9th Cir. 2023) (explaining that applying *Peters* in the context of a defined-benefit plan would be inconsistent with *Thole*).

The district court also cited *TransUnion*, but that decision does not support its view. In *TransUnion*, the Supreme Court explained that merely alleging a statutory violation does not suffice for Article III standing. 594 U.S. at 427. Instead, the plaintiff must demonstrate a "concrete injury," such as physical harm, monetary harm, or those injuries "traditionally recognized as providing a basis for lawsuits in American courts." *Id.* at 425.

51

The district court relied on the "traditionally recognized" language, on the theory that a breach of fiduciary duty is traditionally recognized in trust law as a basis for suit.  Op. 24-25.  But the *Thole* Court rejected that exact trust-law analogy as a basis for standing in claims involving defined-benefit plans.  590 U.S. at 543.  Nothing in *TransUnion* cast doubt on *Thole*; on the contrary, the whole point of *TransUnion* was to *narrow* Article III standing.  *See* 594 U.S. at 427.  Plaintiffs thus have not pleaded standing merely by alleging a breach of fiduciary duty and seeking equitable relief.

## E. Requiring An Actual Or Imminent Harm Best Serves ERISA's Purposes

### 1. ERISA Expressly Permits Annuity Buyout Transactions

At bottom, Plaintiffs simply do not like that their pension benefits were transferred to Athene.  They would prefer to have Lockheed Martin continue to pay the benefits.  But ERISA expressly allows these annuity buyout transactions.  *See* 29 U.S.C. § 1341(b)(3)(A)(i).  Plaintiffs' position basically is a direct challenge to the judgment that Congress made.

ERISA "represents a careful balanc[e]" between protecting beneficiaries of voluntary benefits plans and ensuring that the burdens on employers are not so onerous that the employers decide not to offer those plans in the first place.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 424-25

(2014) (internal quotation marks omitted). One way that Congress encouraged employers to offer benefit plans is by giving them options in how they fund those plans and pay those benefits. For example, employers can choose to offer either defined-benefit or defined-contribution plans. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439-40 (1999). And if an employer chooses to offer a defined-benefit plan, the employer can later transfer the obligations to pay all benefits to an expert annuity provider, like Athene. *See Beck*, 551 U.S. at 101-02.

Annuity buyout transactions can have benefits for both employers and plan participants and beneficiaries. Congress decided that employers should be able to transfer the responsibility for paying benefits if they determine that it makes sense to engage an expert annuity provider. These transactions are also beneficial for plan participants, because they transfer responsibility for pensions to insurers that are in the business of managing assets and paying long-term annuity benefits, and that often are more creditworthy than the beneficiaries' former employers.

Annuity buyout transactions are subject to strict oversight by the federal government. The Department of Labor has issued guidance to employers on how to select an insurer, *see* 29 C.F.R. § 2509.95-1 – guidance that

has proven effective, as no retiree has lost a penny of benefits due to a buy-out transaction since it was issued. The Secretary of Labor could sue the sponsor if a transaction was problematic, such as if the choice of insurer was outside the range of reasonable choices available to the sponsor. *See* 29 U.S.C. § 1132(a)(9).

After the pension obligations are transferred to the insurers, regulatory oversight passes to state insurance regulators. The regulators impose robust capitalization, risk management, and reporting requirements on insurers to minimize the risk of default and to detect issues before there is a default. *See* EBSA Report 18-19. State regulators carefully monitor the insurers and can intervene if a serious risk of nonpayment arises, such as by requiring additional capital contributions. *Id.*

If an insurer became unable to fulfill its obligations, SGAs provide a backstop. They guarantee coverage of benefits when an insurer fails, typically up to $250,000 in present value of annuity benefits per participant. Compl. ¶ 32. Plaintiffs assert that SGAs are less protective than the PBGC, *see id.*, but historically that has not been true. Whereas no retiree has lost any pension benefits as a result of an annuity buyout transaction backed by SGAs in three decades, a recent study of corporate pensions taken over by the PBGC found that sixteen percent of plan participants saw a reduction

in benefits, with an average loss of twenty-four percent of plan benefits. PBGC, *PBGC's Single Employer Guarantee Outcomes*, at i, 16 tbl.11 (May 2019), perma.cc/4TA8-PXPZ.

Plaintiffs' lawsuit is a direct attack on annuity buyout transactions. Their generic allegations that Athene is not the "safest possible" insurer could be made with respect to any insurer involved in a buyout transaction. There are relative advantages and disadvantages to every seller in the competitive insurance marketplace, so there always will be some metric under which a plaintiff could allege that any insurer is not the "safest" option available.

Indeed, plaintiffs recently brought nearly a dozen lawsuits challenging annuity buyout transactions, at least two of which challenge the selection of an insurer (Prudential) that Plaintiffs here allege *is* safe.[11] Plaintiffs also have sued even where (as here) the employer hired an independent fiduciary to select the insurer. *See, e.g.*, *Dempsey* Compl. ¶ 6. So under Plaintiffs' theory of standing, there is nothing an employer could do to prevent being immediately sued after an annuity buyout transaction.

---

[11] *Compare* First Am. Compl. ¶ 2, *Dempsey v. Verizon Commc'ns Inc.*, No. 24-cv-10004 (S.D.N.Y. Apr. 25, 2025) (ECF No. 55) (*Dempsey* Compl.), *and* Compl. ¶ 2, *Spohn v. Int'l Bus. Machs. Corp.*, No. 25-cv-12475 (D. Mass. Sept. 5, 2025) (ECF No. 1), *with* Compl. ¶ 62.

Accordingly, a holding that Plaintiffs have alleged standing would allow a plaintiff to challenge any annuity buyout transaction, overriding Congress's determination to authorize these transactions in the first place. That outcome would benefit no one. It would just discourage employers from engaging in these safe and common transactions, impose needless litigation costs on the parties and the courts, and prevent retirees from benefiting from the expertise and security of highly regulated, top-rated annuity providers.

### 2. Plaintiffs Would Have Recourse If There Was An Imminent Risk Of Nonpayment

Plaintiffs have argued that if they cannot bring their lawsuit now, they would have no recourse in the unlikely event Athene could not pay their benefits in the future. *See* Dkt. 35 at 17 (citing 29 U.S.C. § 1113(1)(A), ERISA's six-year statute of repose). That is incorrect.

First, a plaintiff (or the Secretary of Labor) can sue under ERISA if there is an actual or imminent loss of benefits within the first six years of the transaction. Congress enacted 29 U.S.C. § 1132(a)(9) specifically so that beneficiaries who are no longer plan participants as a result of an annuity buyout transaction can bring a lawsuit if the transaction violates ERISA. *See* 29 U.S.C. § 1132(a)(9). So if, for example, there is a severe underfunding problem at the time of the transaction or within the first six years after

the transaction, a plaintiff could sue the employer under ERISA. That six-year period reflects Congress's determination about the right balance to strike in ERISA. *See Dudenhoeffer*, 573 U.S. at 424-25.

Second, beneficiaries still would have recourse after that time period. The insurer is contractually obligated to pay the beneficiaries' benefits going forward. *See Camire*, 2025 WL 947526, at *4. Each beneficiary is "an intended third-party beneficiary" of the group annuity contract with the right to sue to enforce its terms. *See* Dkt. 65-7, at 22. Beneficiaries thus always have recourse against the insurer.

Beneficiaries have access to ample information to ensure that benefits are funded. Insurers must file reports with state regulators on their financial condition – indeed, Plaintiffs rely on those disclosures in this case. *See* Gober Decl. ¶ 10. If those disclosures indicated underfunding or some other breach of the annuity contract, Plaintiffs could sue the insurer to restore funding before the insurer became unable to make payments. In this case, Plaintiffs admit that Athene has a funding surplus, *see id.*, so there is no basis for them to sue Athene – but the point is that they could if there ever were a real concern about Athene's viability.

Article III's injury requirement exists to ensure that courts intercede only when a plaintiff has been harmed or is imminently at risk of harm.

The Supreme Court "has long rejected" the argument that standing rules should be loosened to ensure that claims can be brought. *Thole*, 590 U.S. at 544-45. Here, Plaintiffs have not been harmed, and they have not pleaded facts plausibly showing that they face any imminent risk of future harm. They thus lack standing to bring their claims.

## CONCLUSION

The Court should reverse the district court's order denying Lockheed Martin's motion to dismiss.

Dated: December 3, 2025

Christopher J. Boran
MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606
(312) 324-1146

Respectfully submitted,

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky
Reginald R. Goeke
Minh Nguyen-Dang
Zachary Krislov
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000
nsaharsky@mayerbrown.com

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), undersigned counsel certifies that this brief:

(i)     complies with the type-volume limitation of Rule 32(a)(7)(B)(i) and Local Rule 32(b) because it contains 12,730 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f); and

(ii)    complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Word for Microsoft Office 365 and is set in Century Schoolbook font in a size equivalent to 14 points or larger.

Dated: December 3, 2025           /s/ *Nicole A. Saharsky*
                                            Nicole A. Saharsky

**CERTIFICATE OF SERVICE**

I hereby certify that on December 3, 2025, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ *Nicole A. Saharsky*
Nicole A. Saharsky