No. 25-2061

IN THE
# United States Court of Appeals for the Fourth Circuit

BRUCE KONYA, *et al.*,

*Plaintiffs-Appellees*,

v.

LOCKHEED MARTIN CORPORATION,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the District of Maryland
Case No. 8:24-cv-00750-BAH
(The Honorable Brendan A. Hurson)

## BRIEF OF AMICI CURIAE IOWA AND 9 ADDITIONAL STATES IN SUPPORT OF APPELLANT

BRENNA BIRD
Attorney General of Iowa

ERIC WESSAN
*Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-8770
eric.wessan@ag.iowa.gov

December 10, 2025

*Counsel for Amici States*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICI CURIAE STATES ..........................................1

SUMMARY OF THE ARGUMENT ...................................................3

ARGUMENT ......................................................................................4

    I.    Plaintiffs Lack A "Concrete" Injury. ....................................5

        A.    Plaintiffs lack injury-in-fact. ......................................6

    II.    Plaintiffs Lack a Concrete "Injury"—Pension Risk Transfers Regulated by State Insurance Regulators Are Safe. ........................................................................8

        A.    State Based Insurance Regulations Are Robust and Effective. ................................................8

        B.    State-Regulated Insurance Companies are Safe. ......................10

        C.    State Regulators Require Insurers to Fully Fund Pension Obligations In Excess of 100%. ...............................16

        D.    Multi-jurisdictional Insurance Groups are Subject to Coordinated Supervision Requirements ...........................19

CONCLUSION .................................................................................25

CERTIFICATE OF COMPLIANCE ..................................................26

CERTIFICATE OF SERVICE ...........................................................27

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*California Auto Ass'n v. Maloney,*
341 U.S. 105 (1951) ..................................................................8
*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ..............................................................5, 7
*Cunningham v. Cornell Univ.,*
145 S. Ct. 1020 (2025) ...........................................................4, 5
*Garey v. James S. Farrin, P.C.,*
35 F.4th 917 (4th Cir. 2022) ......................................................6
*Grp. Life & Health Ins. Co. v. Royal Drug Co.,*
440 U.S. 205 (1979) ..................................................................8
*Hardware Dealers Mut. Fire Ins. Co. v. Glidden,*
284 U.S. 151 (1931) ..................................................................8
*Health Ins. Ass'n of Am. v. Harnett,*
376 N.E.2d 1280 (N.Y. 1978) ....................................................8
*Indus. Servs. Grp., Inc. v. Dobson,*
68 F.4th 155 (4th Cir. 2023) ......................................................6
*Laufer v. Naranda Hotels, LLC,*
60 F.4th 156 (4th Cir. 2023) ......................................................6
*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ..................................................................6
*Pender v. Bank of Am. Corp.,*
778 F.3d 354 (4th Cir. 2016) ......................................................7
*Spokeo, Inc. v. Robins,*
578 U.S. 330 (2016) ..................................................................6
*Thole v. U.S. Bank N.A.,*
590 U.S. 538 (2020) ..................................................................7
*United States v. Texas,*
599 U.S. 670 (2023) ..................................................................6

Statutes

15 U.S.C. § 6701(b) ..................................................................8

## INTEREST OF AMICI CURIAE STATES

Core to the police power is States' authority to regulate insurance. Every State regulates insurance within that State. For example, in Iowa the Iowa Insurance Division regulates insurance activities; that includes monitoring the solvency of insurance companies domiciled in Iowa.

Iowa has long had one of the largest life insurance industries in the United States. Among the Iowa-domiciled life insurance companies subject to IID regulation is the entity Plaintiffs here accuse of being irresponsibly risky, Athene, as well as the related Athene Annuity and Life Company ("AAIA"). Iowa's regulators are responsible for coordinating group supervision of all insurance operations controlled by Athene and its parent company, Apollo Global Management ("Apollo"), including insurance companies across a variety of U.S. and non-U.S. jurisdictions.

Denying the Motion to Dismiss here allows a case to proceed on the basis that Iowa—or other States—are not doing their job in ensuring that insurance companies domiciled in those States are acting responsibly. As the district court acknowledged, Plaintiffs "claim that Athene is especially risky because it is 'a private-equity controlled insurer with a

highly risky offshore structure." Dkt. 79 at 8 (quoting Dkt. 1 at ¶ 3). Plaintiffs allege that relying on Athene breached Defendant's "fiduciary duties by foregoing more appropriate, less risky annuities." *Id.*

Ultimately, Plaintiffs' disagreement with the pension decisions made by Defendant here is a collateral attack on State regulation of insurance. *See, e.g.*, Dkt. 1 at ¶ 30 ("PRT transactions transfer pension obligations 'from ERISA-regulated defined benefit plans to state-law governed insurance companies.'") (quotation omitted). It is a collateral attack on the legitimacy and vital role of insurance commissioners in ensuring that products are safe and that residents of their States are protected. And there is no basis in law or fact to justify this collateral attack.

The district court's decision is 38 pages long, but only three pages address whether Plaintiffs stated a claim as to Counts I and III of the Complaint; that is, whether Defendant's selecting of a well-regulated entity to transfer its pension obligations, including assuming the entire funding risk, breached its fiduciary duty. *Id.* at 32–35. As *Amici* will explain, that judgment could only have been reached if the district court judge failed to properly analyze and assess what was alleged in the

complaint and misunderstood the safety of the pension risk transfer that occurred.

This Court should reverse the district court's determination that this case can proceed on that basis.

## SUMMARY OF THE ARGUMENT

**I.** Plaintiffs lack standing because they lack a concrete injury to confer standing in support of their claims. Plaintiffs allege that there is some additional risk of harm—decades in the future—to their pensions. Factually they are wrong, but even if taken as true their allegations are far too attenuated and require an implausible chain of events insufficient to justify standing. Some sub-percentile future risk is not concrete enough to justify standing to sue here.

**II.** Plaintiffs not only lack a concrete injury, they lack an injury at all. Pension risk transfers are a safe tool that are fully regulated by adept and well-equipped state regulators. Not a single pensioner has lost a single penny from a pension risk transfer transaction in decades. And the specific insurance company here—Athene and its sibling companies—are well-regulated by Iowa's insurance division to ensure

that their products are safe and secured. Without an injury, there is no standing to sue.

**ARGUMENT**

This lawsuit reflects litigation across the country that could upend the vital tool of pension risk transfers—tools that companies use to ensure that retirees receive the benefits that they have earned while ensuring the safety of those pension funds. In the last three decades, not one retiree has lost "a penny under a PRT annuity" regulated by state regulators. *Statement of the 2023 Advisory Council on Employee Welfare and Pension Benefit Plans to the U.S. Department of Labor Regarding Interpretive Bulletin 95-1*, at 4 (Aug. 29, 2023). Yet here, the district court found that Plaintiffs "barely . . . eked out sufficient injury-in-fact to establish standing." Dkt. 79 at 19–20. But that is error. The contingencies that have never occurred and likely will never occur are insufficiently "concrete" to justify standing in this context. *See Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1032 (2025).

And unlike the safe pension-risk transfers, the Pension Benefit Guaranty Corporation, which is responsible for taking over failed pension plans, issued payments to 912,000 retirees in 2024 alone. Those

4

payments are often less than the full benefit owed under the pension plan. Julie A. Su, *Pension Benefit Guaranty Corporation 2024 Annual Report*, Pension Benefit Guaranty Corporation (accessed Dec. 3, 2025), *available at* https://perma.cc/96XM-H9DM.

Plaintiffs also cannot show standing for a second reason: pension risk transfers regulated by States are safe products. Beyond a potential injury-in-fact being "concrete," *see id.*, it also must be an injury. But the retirement products challenged here are safe, economical, and regulated by expert regulators across the country. There is no injury at all.

For both those reasons, this case should have been dismissed.

## I.    Plaintiffs Lack A "Concrete" Injury.

Standing based on "threatened injury" must involve "certainly impending" harm to be the equivalent of an injury-in fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted). But here the threatened injury is ephemeral and chronologically distant. By the district court's ruling, any case that involves an insurance matter may have Article III standing because it might affect some margin the risk profile of the product. The Supreme Court has never endorsed such a broad standing theory.

**A. Plaintiffs lack injury-in-fact.**

"Standing is the 'irreducible constitutional minimum' required to make 'Cases' or 'Controversies' justiciable under Article III, § 2 of the Constitution." *Indus. Servs. Grp., Inc. v. Dobson*, 68 F.4th 155, 167 (4th Cir. 2023). Plaintiffs must establish that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

An injury-in-fact is "'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical.'" *Laufer v. Naranda Hotels, LLC*, 60 F.4th 156, 161 (4th Cir. 2023) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "Plaintiffs who do not have a legally cognizable injury lack standing to bring suit in federal court." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 921 (4th Cir. 2022). That requires "that the dispute is traditionally thought to be capable of resolution through the judicial process." *United States v. Texas*, 599 U.S. 670, 676 (2023).

Standing is a limit on the authority of federal courts to hear cases. *Spokeo*, 578 U.S. at 338. And courts may not find standing relying on a

daisy-chain of "highly attenuated . . . possibilities." *Clapper*, 568 U.S. at 410. Here, the district court deferred ruling on standing until after discovery. Dkt. 79 at 19–20. But the burdensome, expensive, and labor-intensive discovery should not occur if a plaintiff lacks standing and, thus, a court lacks subject matter jurisdiction.

The Supreme Court has established that even equitable remedies under ERISA require meeting the injury-in-fact standard to establish standing. *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 544 (2020). The district court's error likely followed from the lack of reckoning with this Court's precedents in the wake of later Supreme Court opinions reaffirming the need for a real injury-in-fact even in cases involving ERISA. *Compare Pender v. Bank of Am. Corp.* 778 F.3d 354, 366 (4th Cir. 2016) *with Thole*, 590 U.S. at 544. The district court recognized that standing "may be challenged at any time" but failed to take the logical step that it must be resolved when challenged. *See* Dkt. 79 at 27. If at any point in a proceeding standing is found not to be present—and it is Plaintiffs' burden to establish standing—the court lacks subject matter jurisdiction and the complaint should be dismissed without prejudice.

## II. Plaintiffs Lack a Concrete "Injury"—Pension Risk Transfers Regulated by State Insurance Regulators Are Safe.

### A. State Based Insurance Regulations Are Robust and Effective.

Insurance is "a business to which the government has long had a 'special relation.'" *California Auto Ass'n v. Maloney,* 341 U.S. 105, 109 (1951). Since the public interest and general welfare have been found to require regulating the insurance industry to ensure adequate protection for customers, it is properly subject to the exercise of the government's police power. *Id.*; *Hardware Dealers Mut. Fire Ins. Co. v. Glidden*, 284 U.S. 151, 157–158 (1931); *Health Ins. Ass'n of Am. v. Harnett*, 376 N.E.2d 1280 (N.Y. 1978) ("The business of writing insurance is not a right; it is a privilege granted by the State subject to the conditions imposed by the State and to its control and supervision"). Congress delegated the regulation of insurance to the States with the McCarran Ferguson Act in 1945. 15 U.S.C. § 6701(b); *Grp. Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 217–18 (1979) (Congress acted to preserve state-based insurance regulation).

Today, insurance is regulated by the 56 insurance commissioners or directors in each of the U.S. states and territories. Each state regulator

is chiefly responsible for overseeing the financial health of insurance companies domiciled within the state. The regulatory mechanisms in place are effective and thus render rare life insurance company insolvencies. And when insolvency does occur, regulatory intervention ensures that recoveries of amounts due policyholders are maximized, which is further enhanced through the backstop of state guaranty associations. Guaranty associations, created by state statutes, provide benefits to policyholders of an insolvent insurer up to a statutory cap.

And state regulators cooperate through the National Association of Insurance Commissioners ("NAIC"). The effectiveness of the U.S. state-based insurance regulatory framework in safeguarding consumers and ensuring market solvency is rooted in States' ability both to act collectively when needed on national issues and to adapt and innovate to unique local circumstances and market conditions. America's insurance commissioners and their teams work to ensure that the insurance market and the economy at large is strong and stable. Nearly 11,000 insurance regulators are supporting efforts to both expand coverage and lower risk, making coverage more attainable for consumers and markets more stable.

**B.      State-Regulated Insurance Companies are Safe.**

Financial regulators understand that measuring risk can be complex and include several factors. Plaintiffs' purported risk analysis elides complexity and nuance. But the simplified syllogism that pension risk transfers involving some of the most sophisticated nation-wide companies and regulated by the most sophisticated state insurance regulators are riskier fails. For this reason, all United States insurance regulators apply a risk-based capital model to measure solvency. The NAIC was among the first regulatory bodies to apply such a model when it was adopted in 1993. Since then, it has been continuously maintained and updated. The risk-based capital model seeks to measure the adequacy of an insurer's capital and surplus in relation to its insurer-specific risks.

The risk-based capital model quantifies the minimum amount of capital and surplus that must be held in relation to each risk, including asset risk (market and credit), insurance risk, interest rate risk and business risk. As an example of how this model is risk-sensitive, the capital requirements for investments are based on the credit quality of each individual investment held by an insurer. The higher the credit risk,

the more capital must be held. Generally, insurers hold many multiples (3-to-5 times) of the minimum requirement to maintain rating agency financial strength ratings.

One significant area that affects the risk held by an insurer is its use of reinsurance. Much in the same way insurance transfers financial risk associated with a possible event from an individual or business to an insurance company, reinsurance provides for the further transfer of insured risks to a reinsurance company. By doing so, the insurer can reduce its exposure to risk it has insured. Nearly every insurer uses some amount of reinsurance. Reinsurance ensures insurers can write a meaningful level of insurance protection to policyholders without risking insolvency associated with severe claim experience. It also facilitates the raising of capital that is needed to support the global insurance market by allowing risk to be moved to where capital can be accessed.

The most common type of reinsurance contract in the life and annuity industry is proportional reinsurance, which transfers a share (e.g. 25%, 60%, etc.) of all significant risks of an insurance policy to a reinsurer. There are several forms of proportional reinsurance that can be used, but all forms have the same economic effect of transferring a

proportional share of all significant risks of an insurance policy to the reinsurer.

That guarantee is not merely customary, it is required by Appendix A-791 of the NAIC Accounting Practices and Procedures Manual which is adopted by law in all states. *See* NAIC Accounting Practices and Procedures Manual as of March 2025, *available at* https://content.naic.org/sites/default/files/publication-app-manual.pdf.

Appendix A-791 requires that all significant risks, including investment risk, must be fully transferred to the reinsurer to take credit for the reinsurance. If the risk of the investments is not transferred, no credit for the reinsurance is taken for accounting or capital requirement purposes. Insurers assess and document their risk transfer analysis when entering into reinsurance agreements, which is subject to verification by independent auditors during financial statement audits and by regulators during exams and transaction reviews.

When a proportional reinsurance agreement meets the risk transfer requirements, the required capital is reduced by the share of the risk that has been transferred. The corollary of that is that the reinsurer, having assumed the risk, will have to establish the required capital on

its balance sheet to account for the risk that it has assumed. In other words, the capital requirements simply follow the risk to the insurer (or reinsurer) holding the risk.

While the ceding insurer has mitigated the risk of the reinsured business itself, it remains exposed to credit risk of the reinsurer. That is because the ceding insurer remains directly liable to policyholders, subject to indemnification by the reinsurer. Risk is mitigated through reinsurance only if the ceding insurer can collect the amounts contractually due under the reinsurance agreement. To mitigate that collectability risk, cedants require collateral to be retained.

The most common collateral arrangements are in the form of Funds Withheld Coinsurance ("FwH") and Modified Coinsurance ("Modco"). Unlike pure coinsurance, where all the assets and liabilities are fully removed from the ceding insurer's balance sheet, FwH and Modco arrangements withhold assets equal to the liabilities. All the risks associated with the retained assets are still transferred to the reinsurer, and the net economics of the assets and liabilities are settled between the parties on a quarterly or more frequent basis. Still, the benefit to the

structure is that the ceding insurer has immediate access to the retained assets upon a default of the reinsurer.

Modco is thus a safer form of reinsurance than pure coinsurance. Indeed, all States have adopted laws and regulations that require Modco-type collateral except in instances where the reinsurer has been explicitly licensed to conduct uncollateralized reinsurance in that state.

Because the ceding company retains collateral in FwH and Modco reinsurance, the assets and liabilities continue to be reported on a gross basis, but the capital requirements will move from the ceding insurer to the reinsurer. So any insurer with significant FwH or Modco reinsurance, will appear to have a lower surplus to liability ratio for the ceding company.

That in no way reflects the solvency of a ceding insurer when compared to an insurer that uses less reinsurance or uses pure coinsurance. So rather than "appear to have more free capital than they do," Dkt. 1 at ¶¶ 51–52, the opposite is true. That is why regulators use the risk-based capital model for such an assessment. The treatment of Modco under the NAIC accounting and capital model is not an oversight on the part of regulators. Rather, the risk-based capital model is

intentionally designed to incorporate the effects of reinsurance and reinsurance collateral arrangements. That is expressly recognized in the NAIC Risk Based Capital Instructions:

> When the default risk in modified coinsurance (MODCO) and other reinsurance transactions with funds withheld is transferred, this transfer should be recognized by reducing the RBC for the ceding company and increasing it for the assuming company. In the event that the entire asset credit or variability in statement value risk associated with the assets supporting the business reinsured is not transferred to the assuming company for the entire duration of the reinsurance treaty, the RBC for the ceding company should not be reduced.

For actual numbers, Defendant could look to its chosen insurer Athene's annual Form 10-K public disclosure filed with the Securities and Exchange Commission. This disclosure provides a consolidated measure of Athene's capital. As of its 2023 10-K, Athene held $17.8 billion of capital to support its liabilities. That is a significant surplus over liabilities and shows the safety of this state-regulated insurance company.

This example represents just a slice of the type of sophisticated regulatory work that States and state insurance regulators perform in modeling the safety and security of these products for consumers.

## C. State Regulators Require Insurers to Fully Fund Pension Obligations In Excess of 100%.

Beyond the risk-based capital requirements and impacts of reinsurance, it is important to note that risk-based capital requirements reflect what is required to be funded in excess of the liability. The liabilities themselves are valued under the very conservative reserving standards established by the NAIC. As a simplified rule of thumb, reserves are intended to be valued to be enough in 70% of economic scenarios over a 10-year time horizon and RBC adds capital requirements to cover up to 95% of economic worst-case scenarios. Even then, insurers typically hold 3-5 times that level of required capital. The result is that not only are insurers required to fully fund the expected liabilities that will be owed, but they also must maintain funds to cover nearly all possible adverse scenarios.

If an insurer fails to maintain this level of capitalization, state regulators are required to intervene to preserve maximum benefit coverage for policyholders. To avoid needing such intervention, regulators also monitor insurers on an ongoing basis and will usually identify any weakening of a particular insurer or insurer group long prior to triggering regulatory intervention. Regulators possess many tools to

address such issues before the triggering of formal regulatory intervention. As regulatory intervention begins at 100% Company Action Level risk-based capital, even in the rare cases where formal regulatory intervention does occur, it is designed to occur while the insurer has still fully funded its liabilities plus retains a surplus buffer.

In contrast, ERISA plan sponsors need not have fully funded pension liabilities at all times. Public data widely reflects the fact that U.S. pension plans have been significantly underfunded. The Milliman 100 Pension Funding Index, which covers the 100 largest pension plans in the U.S., shows that since 2008, the largest pension plans have had assets less than liabilities in all but 3 years. *See* Pension Funding Index April 2025, Milliman, available at https://www.milliman.com/en/insight/pension-funding-index-april-2025. State-regulated insurance companies are not allowed to underfund their liabilities in that manner.

As noted before, Athene has approximately $220 billion of assets available across its organization to pay $200 billion of AAIA liabilities, conservatively valued. As a generalized illustration, that means that the first level of formal regulatory intervention would occur if Athene

17

experienced $15 billion of losses on its investment portfolio, leaving it with $205 billion of assets, which would still be enough to cover its liabilities. Assuming timely intervention by the regulator, Athene would not be permitted to stop making benefit payments. Rather, the insurance regulators would reduce any further loss of assets to ensure that benefit payments could continue. That contrasts with the Plaintiff's claim that Athene is at significant risk of failure. Regulatory intervention of an insurer in Athene's capital position is highly unlikely, and any intervention would have the goal of preventing an interruption in benefits.

Only if the remaining $205 billion of Athene's post-intervention assets were fully depleted without fully discharging its policyholder obligations would policyholders rely on guaranty associations to collect benefits. In such a case, the remaining shortfall in benefits after using the $205 billion of assets, if any, would be a fraction of the benefits owed. Thus, even in the worst-case, remote possibility of a liquidation scenario, the state-based regulatory mechanisms ensure that benefit payments to policyholders are maximized.

### D. Multi-jurisdictional Insurance Groups are Subject to Coordinated Supervision Requirements

The district court unduly credited Plaintiffs' allegations that Athene's corporate structure including a subsidiary in Bermuda increased Plaintiffs' pension risk. *See* Dkt. 79 at 18 (citing Dkt. 1 ¶¶ 48, 53–54). Not so. Plaintiffs make several incorrect or unsubstantiated claims about Bermuda's regulatory environment and ignoring how regulation of multi-jurisdictional insurance groups is coordinated. Plaintiffs allege that, "In Bermuda, 'capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero.'" *See* Dkt. 1 at ¶ 48. But Plaintiffs misunderstand the relationship between Bermuda-based subsidiaries and American regulators.

State insurance regulators have been reviewing life reinsurance transactions involving Bermuda reinsurers for roughly a decade. Iowa's insurance regulators have found that capital requirements and investment limitations in Bermuda are comparable with the U.S. Where differences often are observed is in the valuation of reserves. Bermuda uses a fair value and principles-based reserving framework, while States use an amortized cost and prescriptive framework. *See* International

Association of Insurance Supervisors, *Issues Paper on structural shifts in the life insurance sector* (Nov. 2025) (on file with IAIS), *available at* https://perma.cc/6UZD-G649. For that reason, collaboration between state insurance regulators and the Bermuda Monetary Authority ("BMA") is essential for ensuring reserve valuation remains prudent in cross-border reinsurance transactions.

Both state insurance regulators and the BMA must approve any reinsurance transactions between affiliates. Those approvals usually involve several months of intensive review to understand key assumptions that may result in differences between the jurisdictions. The NAIC has developed tools to assist in these reviews including the development of a "Reinsurance Worksheet" published by the NAIC Macroprudential Working Group. The NAIC also continues to build additional tools to facilitate ongoing monitoring, including an Actuarial Guideline recently adopted by the NAIC Life Actuarial Task Force to give U.S. regulators more transparency into asset adequacy on an ongoing basis.

Those efforts do not imply that NAIC is developing those tools because NAIC views Bermuda as having lax regulatory standards. *Cf.*

Dkt. 1 ¶ 48. Indeed, the NAIC has recognized Bermuda as a reciprocal jurisdiction after a rigorous review. That means that NAIC regulators concluded that the Bermuda regulatory system is effective in producing comparable outcomes to the NAIC system. *See* National Association of Insurance Commissioners, *NAIC List of Reciprocal Jurisdictions* 2 (2024), *available at* https://perma.cc/R6FG-WRDX. The only qualified reciprocal jurisdictions are the European Union, United Kingdom, Bermuda, Japan, and Switzerland—putting Bermuda in a highly select group of countries.

As their example of Bermuda's alleged lower capital requirements, the Plaintiffs state, "[t]he Bermuda Solvency Capital Requirement (BSCR) requires insurers to hold similar levels of capital against both corporate bonds and [Collateralized Loan Obligations] CLOs, even though some CLO tranches have a larger downside risk than bonds with the same credit rating." Dkt. 1 ¶ 48 (quotation omitted). American risk-based capital system also requires insurers to hold the same level of capital against both corporate bonds and CLOs. So the critique is odd as leveled against Bermuda. The same critique could be leveled against United States-based regulators. Indeed, the NAIC Capital Adequacy

Task Force currently has a project underway to develop tailored risk-based capital requirements for CLOs which the Bermuda regulatory authority has been closely following.

Nor should NAIC's attention on this area imply that CLOs are inherently greater risks than equivalently rated corporate bonds. Performance of CLOs has in fact been better than equivalently rated corporate bonds since the investment first was introduced in the mid-1990s. *See* Meredith Coffey, *CLOS: SUPERIOR PEROFRMANCE*, LSTA 30 (July 13, 2022), *available at* https://perma.cc/5Q69-A29W. NAIC is investigating how CLOs will be expected to perform in severe economic scenarios that have yet to be encountered. In those scenarios, losses could be more severe than equivalently rated corporate bonds, particularly in lower rated and residual tranches. Athene and other life insurers primarily invest in investment-grade (BBB-rated or above) CLO tranches, and the majority of that allocation is A- or above.

States have adopted requirements for Insurance Company Holdings Systems. *See, e.g.*, Iowa Code chapter 521A (requirements include appropriate group supervision mechanisms when applicable, filing confidential group capital calculation reports, an enterprise risk

report, a liquidity stress test, and required pre-approval of certain transactions between affiliates among other reporting above and beyond the domestic insurance entity). For example, for all groups with reinsurance affiliates in Bermuda, Iowa's state regulator and Bermuda's regulator will jointly review the impacts to each applicable entity and to the group of all terms in the reinsurance treaty before approval. As part of that approval, both State and Bermuda-based regulators will ensure the terms of agreements are arm's length, despite the affiliated nature of the agreement.

Insurance groups meeting certain minimum threshold of size and international activity are also required to be designated as an "internationally active insurance group" subject to the requirements of the International Association of Insurance Supervisors. *See*, *e.g.*, Iowa Code §§ 521A.1(10), 521A.4. That includes the Insurance Core Principles and ComFrame, which form the globally accepted framework for insurance supervision. ComFrame is an extra layer of principles above the Insurance Core Principles meant to provide further supervision of internationally active insurance groups, given their systemic importance due to complexity, size and international reach. *See Insurance Core*

*Principles and ComFrame*, International Association of Insurance Supervisors (Dec. 5, 2024), *available at* https://perma.cc/3P2L-FVZL.

Relevant here, Athene was designated as an internationally active insurance group in February 2024. That designation increased the supervisory requirements for Athene, including imposing the U.S. version of a global insurance capital standard. It also requires the establishment of a Recovery Plan, which provides supervisors with the company's detailed plan of how it would restore its financial health after a period of severe stress or financial instability. To reiterate, these requirements apply to Athene at a group level, inclusive of operations in all jurisdictions—including Bermuda. Designation as an internationally active insurance group also means that the company will be subject to the International Association of Insurance Supervisors' data collection and review to monitor financial stability and macroprudential impacts to the insurance industry and the broader financial sector.

# CONCLUSION

For these reasons, this Court should reverse and render, granting the motion to dismiss.

December 10, 2025

Respectfully submitted,

BRENNA BIRD
Attorney General of Iowa

*/s/ Eric H. Wessan*
ERIC H. WESSAN
*Solicitor General*

Hoover State Office Building
1305 East Walnut Street
Des Moines, Iowa 50319
(515) 823-9117 / (515) 281-5191
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov

*Counsel for Amici States*

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Local R. 29(b), I certify the following:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(4) because it contains 4,479 words, excluding those parts exempted by Fed. R. App. P. 32.

2. This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because the brief has been prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft Office 365.

3. This brief complies with the electronic filing requirements because the text of the electronic brief is identical to the text of the paper copy and because the electronic version of this brief has been scanned for viruses and no viruses were detected.

December 10, 2025

*/s/ Eric H. Wessan*
ERIC H. WESSAN
*Solicitor General*

*Counsel for Amici States*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on December 11, 2025. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

December 10, 2025

/s/ *Eric H. Wessan*
ERIC H. WESSAN
*Solicitor General*

*Counsel for Amici States*

**ADDITIONAL ATTORNEYS GENERAL IN SUPPORT**

Steve Marshall
Attorney General of Alabama

Tim Griffin
Attorney General of Arkansas

Raúl R. Labrador
Attorney General of Idaho

Theodore E. Rokita
Attorney General of Indiana

Liz Murrill
Attorney General of Louisiana

Austin Knudsen
Attorney General of Montana

Michael T. Hilgers
Attorney General of Nebraska

Gentner Drummond
Attorney General of Oklahoma

Ken Paxton
Attorney General of Texas