**25-2061**

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

───────────────────────

LOCKHEED MARTIN CORPORATION,

*Appellant*

–v–

BRUCE KONYA, SIMON SHIFF, STEPHEN SWARTZ, AND DIANA VASQUEZ, INDIVIDUALLY AND AS REPRESENTATIVES OF A CLASS OF PARTICIPANTS AND BENEFICIARIES ON BEHALF OF THE LOCKHEED MARTIN CORPORATION SALARIED EMPLOYEE RETIREMENT PROGRAM AND THE LOCKHEED MARTIN AEROSPACE HOURLY PENSION PLAN,

*Appellees.*

On Appeal from the United States District Court
for the District of Maryland, Northern Division
The Honorable Brendan A. Hurson, 8:24–cv–00750–BAH

───────────────────────

### APPELLEES' PAGE-PROOF OPENING BRIEF

───────────────────────

January 23, 2026

Elizabeth Hopkins
HOPKINS ERISA LAW
12123 Laurel Terrace Drive
Studio City, CA 91604
Tel: (301) 938-7516
hopkinserisalaw@outlook.com

Cyril V. Smith
Aaron S.J. Zelinsky
ZUCKERMAN SPAEDER LLP
100 East Pratt Street – Ste 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
csmith@zuckerman.com
azelinsky@zuckerman.com

*Appellees' Counsel continued on inside front cover*

Sean E. Soyars
Jerome J. Schlichter
SCHLICHTER BOGARD LLC
100 South 4th Street – Ste 1200
St. Louis, MO 63102
Tel: (314) 621-6115
ssoyars@uselaws.com
jschlichter@uselaws.com

Bryan M. Reines
ZUCKERMAN SPAEDER LLP
2100 L Street – Ste 400
Washington, D.C. 20037
Tel: (202) 788-1800
breines@zuckerman.com

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-2061__          Caption: __Konya v. Lockheed Martin Corp.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Bruce Konya, Simon Shiff, Stephen Schwarz, and Diana Vasquez, individually and as representatives__
(name of party/amicus)

__of a class of participants,__

who is _____appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?                          ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                     ☐YES ☑NO
     If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?                ☑YES ☐NO
         If yes, identify entity and nature of interest:

         Lockheed Martin Corporation is the appellant-defendant.


5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
         If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:


6.      Does this case arise out of a bankruptcy proceeding?                ☐YES ☑NO
         If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.


7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
         If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.


Signature: /s/ Sean E. Soyars                          Date:      9/23/2025

Counsel for: Appellees

Print to PDF for Filing        Reset Form

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................. i

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION .................................................................. 1

JURISDICTIONAL STATEMENT ............................................ 4

STATEMENT OF THE ISSUE ................................................ 4

STATEMENT ....................................................................... 4

    A.  Statutory Background ................................................. 4

          1.  ERISA's Statutory Protections to Ensure Retirement Income Security .............................................. 4

          2.  The Termination of Pension Protections for Participants ..... 6

          3.  The Collapse of Executive Life and the Pension Annuitants Protection Act of 1994 ............................ 9

    B.  Allegations of the Complaint ...................................... 14

    C.  Procedural History .................................................. 21

SUMMARY OF THE ARGUMENT ........................................ 23

STANDARD OF REVIEW .................................................... 27

ARGUMENT ...................................................................... 27

    A.  ERISA Explicitly Allows Pension Beneficiaries to Sue When an Employer Purchases a Risky Annuity ........................... 31

    B.  Pensioners Suffered a Concrete Injury Comparable to Those Long Recognized at Contract Law ...................................... 36

          1.  Lockheed's Selection of the Riskiest Possible Annuity Constitutes a Harm Comparable to Improper Delegation at Contract Law ................................................. 37

i

2.    The Loss of Valuable Benefits, Including PBGC Coverage, Constitutes an Injury Comparable to Failure to Perform at Contract Law ........................................................................ 43

C.   Lockheed's Fiduciary Violation Bears a Close Relationship to Harms at Trust Law ........................................................................ 48

D.   The Substantial Increase in Risk that Athene Will Default Is an Independent Ground for Standing ............................................... 52

E.   Lockheed's Selective and Questionable Proffered "Facts" Are Outside the Scope of the Complaint and Should Not Be Considered at This Stage ............................................................ 60

CONCLUSION ........................................................................................... 64

CERTIFICATE OF COMPLIANCE ....................................................... 65

CERTIFICATE OF SERVICE ................................................................. 66

ii

# TABLE OF AUTHORITIES

## Cases

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) ................................................................. 37

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir. 2017) .................................................. 56

*Beck v. Pace Intern. Union,*
   551 U.S. 96 (2007) ...................................................... 7, 44, 45

*Berkley v. Mountain Valley Pipeline, LLC,*
   896 F.3d 624 (4th Cir. 2018) .................................................. 27

*Bussian v. RJR Nabisco, Inc.,*
   223 F.3d 286 (5th Cir. 2000) .................................................. 10

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ................................................................. 42

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ................................................................. 53

*Cunningham v. Cornell Univ.,*
   604 U.S. 693 (2025) ................................................................. 33

*David v. Alphin,*
   704 F.3d 327 (4th Cir. 2013) .................................................. 58

*Davoue v. Fanning,*
   2 Johns. Ch. 252  (N.Y. Ch. 1816) ........................................ 51

*Doherty v. Bristol-Myers Squibb Co.*,
No. 24-CV-06628 (MMG), 2025 WL 2774406 (S.D.N.Y. Sept. 29, 2025)
............................................................7, 20, 37, 44, 45, 46, 54, 58, 61

*Donald v. Wexford Health Sources, Inc.*,
982 F.3d 451 (7th Cir. 2020)................................................42

*Donovan v. Bierwirth*,
680 F.2d 263 (2d Cir. 1982) ...............................................31

*Dreher v. Experian Information Solutions, Inc.*,
856 F. 3d 337 (4th Cir. 2017)..............................................28

*Edwards v. City of Goldsboro*,
178 F.3d 231 (1999) ...........................................................61

*Erickson v. Pardus*,
551 U.S. 89 (2007) .............................................................60

*Friends of the Earth, Inc. v. Laidlaw Environmental Svcs., Inc.*,
528 U.S. 167 (2000)............................................................43

*Fusaro v. Cogan*,
930 F.3d 241 (4th Cir. 2019)...............................................54

*Gestamp South Carolina, L.L.C. v. N.L.R.B.*,
769 F.3d 254 (4th Cir. 2014)...............................................49

*Gollust v. Mendell*,
501 U.S. 115 (1991)............................................................39

*Holmes v. Elephant Ins. Co.*,
156 F.4th 413 (4th Cir. 2025) ........................................56, 57

*Kayes v. Pacific Lumber Co.*,
    51 F.3d 1449 (9th Cir. 1995) .............................................. 10, 11, 12, 34

*Kerns v. United States*,
    585 F.3d 187 (4th Cir. 2009) ........................................................ 21, 27

*Lange v. Houston County, Georgia*,
    152 F.4th 1245 (11th Cir. 2025) .......................................................... 47

*MacDonald, Summer & Frates v. Yolo County*,
    477 U.S. 340 (1986) ............................................................................. 49

*Manning v. Caldwell*,
    930 F.3d 264 (4th Cir. 2019) (en banc) ............................................... 54

*Mountain States Legal Found. v. Glickman*,
    92 F.3d 1228 (D.C. Cir. 1996) ............................................................ 57

*Nachman Corp. v. Pension Benefit Guar. Corp.*,
    446 U.S. 359 (1980) ....................................................................... 31, 36

*Nat'l Labor Relations Bd. v. Bluefield Hosp. Co.*,
    821 F.3d 534 (4th Cir. 2016) ............................................................... 54

*Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*,
    462 U.S. 669 (1983) ............................................................................. 47

*Pender v. Bank of America Corp.*,
    788 F.3d 354 (4th Cir. 2015) ....................................................... 3, 26, 51

*Peters v. Aetna, Inc.*,
    2 F.4th 199 (4th Cir. 2021) ............................ 3, 22, 23, 25, 26, 48, 49, 51

*Pilot Life Ins. Co. v. Dedeaux*,
    481 U.S. 41 (1987) ............................................................................... 32

*Republican Party v. Martin,*
   980 F.2d 943 (4th Cir. 1992) ................................................................ 62

*Roth v. Jennings,*
   489 F.3d 499 ........................................................................................ 62

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016) .............................................................. 3, 24, 28

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) ...................................................................... 26, 54

*Tatum v. RJR Pension Inv. Comm.,*
   761 F.3d 346 (4th Cir. 2014) ......................................................... 31, 45

*Thole v. U.S. Bank, N.A.,*
   590 U.S. 538 (2000)
   ........................... 21, 25, 26, 29, 31, 36, 43, 44, 45, 48, 49, 52, 54, 55, 58

*Till v. SCS Credit Corp.,*
   541 U.S. 465 (2004) .............................................................................. 40

*Toll Brothers, Inc. v. Township of Readington,*
   555 F.3d 131 (3d Cir. 2009) ................................................................. 43

*TransUnion LLC v. Ramirez,*
   594 U.S. 413 (2021) ................................................. 3, 24, 29, 35, 36, 37

*Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life*
   *Insur. Co.,* 783 F. Supp. 899 (D.N.J. 1992) ........................................... 9

*U.S. Tr. Co. of New York v. New Jersey,*
   431 U.S. 1 (1977) .................................................................................. 40

vi

*Virginia Elec. & Power Co. v. Bransen Energy, Inc.*,
 850 F.3d 645 (4th Cir. 2017) ...................................................................38

**Statutes**

28 U.S.C. § 1292(b) ..................................................................................4, 23

28 U.S.C. § 1331 .............................................................................................4

29 U.S.C. § 1001(b) ..................................................................................4, 32

29 U.S.C. § 1001b(a)(2)-(3) ........................................................................35

29 U.S.C. § 1002(23) ......................................................................................5

29 U.S.C. § 1024 .............................................................................................5

29 U.S.C. § 1053 ...........................................................................................36

29 U.S.C. § 1054 .............................................................................................5

29 U.S.C. § 1058 .............................................................................................5

29 U.S.C. § 1059 .............................................................................................5

29 U.S.C. § 1101 .............................................................................................5

29 U.S.C. § 1103(c) .........................................................................................5

29 U.S.C. § 1104 .............................................................................................5

29 U.S.C. § 1104(a) ......................................................................................41

29 U.S.C. § 1104(a)(1) ..................................................................................31

29 U.S.C. § 1104(a)(1)(B) ............................................................................32

29 U.S.C. § 1113 ....................................................................... 6

29 U.S.C. § 1113(1) ................................................................ 35

29 U.S.C. § 1132(a) ................................................................ 33

29 U.S.C. § 1132(a)(1)-(3) ..................................................... 6

29 U.S.C. § 1132(a)(9) .............................. 12, 13, 20, 23, 24, 33, 34, 35, 52

29 U.S.C. § 1132(e) ................................................................. 4

29 U.S.C. § 1144(a) ................................................................. 5

29 U.S.C. § 1321 .................................................................... 36

29 U.S.C. § 1341 ..................................................................... 5

29 U.S.C. § 1381 ..................................................................... 5

29 U.S.C. §§ 1082-83 ............................................................ 36

29 U.S.C. §§ 1082-84 .............................................................. 5

29 U.S.C. §§ 1301-08 .............................................................. 5

42 U.S.C. § 274e .................................................................... 42

## Other Authorities

California Department of Insurance, Settlement in Executive Life
  Insurance Case Ends 16 Years of Litigation  (Jul. 9, 2015) [available
  at https://www.insurance.ca.gov/0400-news/0100-press-
  releases/archives/release068-15.cfm] .................................................. 60

David G. Eichhorn, *Pension Risk Transfers May Be Transferring Risk to Beneficiaries*, NISA (Oct. 13, 2022) [available at https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/] ........................................................ 19

*Kayes v. Pacific Lumber Co.*, CV-89-3500-TEH (N.D. Cal.) Dkt. 1 (filed Sept. 25, 1989) ...................................................................................... 10

*Oversight Hearing on the Effect on Plan Participants of Insurance Company Failures, Hearing Before the Subcomm. On Labor-Management Relations of the Comm. On Educ. & Labor*, 102**d** Cong. 26 (July. 25, 199**1**) ................................................................................. 11

*Recent Court Decisions Affecting ERISA and Executive Life Annuities: Hearing Before the Subcomm. On Labor of the Comm. On Labor & Human Resources*, 103 Cong. 7, S. 1312, S. Hrg. 103-443 (1994) . 12, 34

Restatement (Second) of Contracts § 317(2)(a) (1981) ..................... 38, 41

Restatement (Second) of Trusts § 170(1) ................................................ 51

Serge Agres & Jacob Goldberg, *Pension Risk Transfers Have Several Downside Risks for US Plan Sponsors* (Mar. 2022) [available at https://www.cambridgeassociates.com/insight/pension-risk-transfers-have-several-downside-risks-for-us-plan-sponsors/] ............................. 8

Sven Klingler, Suresh Sundaresan & Michael Moran, *Corporate Pension Risk Transfers*, Management Science – *Articles in Advance* (Aug. 2025) ...................................................................................................... 8

**Rules**

Fed. R. App. P. 28(j) .............................................................................. 50

Fed. R. Civ. P. 12(b)(6) ......................................................................... 21

**Regulations**

29 C.F.R. § 1604.9(a) ................................................................ 47

Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 (1995) ........... 13, 40, 41

29 C.F.R. § 2509.95-1(c) ....................................................... 14, 41

29 C.F.R. § 2509.95-1(d) (1995) ............................................. 40

**Constitutional Provisions**

U.S. Const. art. III, § 2 ……….. 4, 21, 23, 24, 25, 27, 28, 31, 35, 37, 39, 43, 47, 53, 57

**Legislative Materials**

Employee Retirement Income Security Act of 1974, Pub. L. 93-406, 88 Stat. 829 (codified at 29 U.S.C. Ch. 18) (1974) ...................................................................... 4, 23, 28

Pension Annuitants Protection Act of 1994,  Pub. L. 103-401, 108 Stat. 4172 (1994) ..................................................... 9, 12, 13, 32, 34

Title VII of the Civil Rights Act of 1964, Pub. L. 88-352, 78 Stat. 241 (1964) ................................................................................ 47

## INTRODUCTION

Appellees (the "Pensioners") seek to save their retirements. Congress explicitly granted pensioners like them the ability to sue in circumstances like these, where an employer ejected them from their pension plans and forced them into risky annuities, injuring their core ERISA rights to the security of their retirement income. The District Court properly held that Appellees have standing to challenge that fiduciary breach.

This is not the first time this story has played out. In the 1980s, many companies terminated their employees' pension plans and replaced them with cheap and risky annuities issued by a company called Executive Life. Executive Life then collapsed. Congress recognized that terminating pensions and replacing them with risky annuities posed a threat to ERISA's central purpose. Because judicial decisions had raised doubts about whether pensioners whose pensions had been terminated could sue under ERISA, Congress, in 1994, enacted a new right of action for individuals triggered by the "purchase" of a risky annuity to seek "adequate security" for future payments.

Today's version of Executive Life is Athene, a risky, private-equity backed insurer engaged in similarly dubious investment strategies, dependent on its Bermuda affiliates, wrapped in a web of related offshore reinsurers, and possessing a one-in-five risk of default. The Complaint plausibly alleges that Athene's promise to pay Pensioners what they are owed is far riskier than Lockheed's federally regulated and insured pension, and that the risk of a future default is a concrete injury similar to traditional contract and trust claims.

Lockheed argues that only present or imminent out-of-pocket monetary loss qualifies as a concrete injury, but that flies in the face of Article III jurisprudence and Congress's clear intent to create a right to sue grounded in the history and tradition of contract and trust law. Moreover, Lockheed's argument that Pensioners must wait for default would hollow out—if not outright nullify—the actions Congress took to protect retirees from situations exactly like these. Pensions are supposed to last for decades, through up and down business cycles, and provide guaranteed income to pensioners for their entire lives. When that income fails or is interrupted, it is a disaster for retirees, who depend on the consistent stream of payments a defined-benefit plan provides for their

2

entire lives. But Lockheed's position would leave pensioners whose annuity provider defaults (or whose pensions start) six years after the annuity purchase, with no recourse at all.

Lockheed's position is thus inconsistent not only with the judgment of Congress, but also with the Supreme Court's rejection of a monetary loss-only standard in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), and *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016). And it flies in the face of this Court's holdings that a fiduciary breach necessarily gives rise to standing to seek equitable relief, in *Peters v. Aetna, Inc.*, 2 F.4th 199 (4th Cir. 2021), and *Pender v. Bank of America Corp.*, 788 F.3d 354 (4th Cir. 2015).

To the extent Lockheed argues that the Athene annuity is less risky than Pensioners have pled, or that state-level guarantees suffice in place of federal protections, those arguments are for the summary judgment stage (and are wrong to boot). The only question now is whether the Pensioners have sufficiently alleged standing. They have.

This Court should affirm.

## JURISDICTIONAL STATEMENT

The District Court had federal question jurisdiction under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e). This Court has jurisdiction under 28 U.S.C. § 1292(b).

## STATEMENT OF THE ISSUE

Whether the District Court properly held that plaintiffs have Article III standing when they plausibly allege that the employer ejected them from their federally insured pension plan, stripped them of federal insurance, and purchased for them a risky annuity, subjecting them to both a large and a substantially increased risk that they will not receive their earned and fully vested retirement payments?

## STATEMENT

### A.    Statutory Background

#### 1.    ERISA's Statutory Protections to Ensure Retirement Income Security

As its name makes clear, Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA) to ensure Americans' "retirement income security." 29 U.S.C. Ch. 18. Critical to that effort was "protect[ing] . . . the interests of participants in employee benefit plans. . . ." 29 U.S.C. § 1001(b). Congress did so by creating a

4

comprehensive statutory scheme for regulating and insuring plans to reduce the risk of default and attendant harm to retirement income security. Once an employer offers an ERISA-covered plan (including the defined-benefits plans in this case), ERISA's requirements apply. 29 U.S.C. § 1101. These comprehensive legal protections include:

- *Prohibition against self-inurement*—an employer cannot use plan assets for its own benefit. 29 U.S.C. § 1103(c);

- *Fiduciary standards of prudence and loyalty* for the plan administrator. 29 U.S.C. § 1104;

- *A right to payment* by the employer of an "accrued benefit" based on years of service, regardless of the plan assets. 29 U.S.C. §§ 1002(23), 1054;

- *Reporting obligations and federal regulation* of plan investments to prevent shortfalls. 29 U.S.C. §§ 1024, 1059 (reporting), §§ 1082-84 (minimum funding);

- *Federal insurance* in the event a plan fails. 29 U.S.C. §§ 1301-08;

- *Restrictions on plan termination.* 29 U.S.C. §§ 1058 (merger), 1381 (withdrawal from multi-employer plan), 1341 ("standard" and "distress" plan terminations).

To make it easier for businesses with nationwide operations to operate pension plans, ERISA also displaced and preempted participants' state law contractual rights and replaced them with federal statutory rights. 29 U.S.C. § 1144(a). Congress also created a federal mechanism

5

for the enforcement of these federal rights, allowing "a participant or beneficiary" ("pensioners")[1] to sue in federal court to enforce ERISA's protections.  29 U.S.C. § 1132(a)(1)-(3).  Congress then limited when pensioners may file such suits.  A pensioner in a terminated plan must sue for breach of fiduciary duty "after the earlier of—(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation."  29 U.S.C. § 1113.

## 2. The Termination of Pension Protections for Participants

Lockheed has chosen to eject a group of pensioners from their defined-benefit pension plan and to replace that commitment with an annuity.  This process is sometimes referred to with the shorthand "Pension Risk Transfer," though the term appears nowhere in ERISA.  *See* Compl. ¶¶ 23-29.  An employer (especially one who administers its

---

[1] This brief uses the term "pensioners" to refer to participants and beneficiaries of ERISA plans generally, and the upper-case "Pensioners" to refer to the specific participants and beneficiaries in this case.

own plan) has an incentive to purchase the cheapest annuity available to maximize the savings from eliminating its future pension obligations. *See* Compl. ¶4.

After pensioners are ejected from a plan, neither the annuity provider nor the employer owes the pensioners *any* fiduciary duty, let alone the "highest known to law" that the employer formerly owed pensioners under ERISA. *Doherty v. Bristol-Myers Squibb Co.*, 2025 WL 2774406, at *7-8 (S.D.N.Y. Sept. 29, 2025). Neither the employer nor the annuity provider is "subject to ERISA's multitudinous requirements . . . [a]nd the PBGC is likewise no longer liable for the deficiency in the event that the plan becomes insolvent; there are no more benefits for it to guarantee." *Beck v. Pace Intern. Union*, 551 U.S. 96, 106 (2007); Compl. ¶ 30. Pensioners can (at most) sue the annuity provider to pursue state law remedies, as (at best) third-party beneficiaries to a contract between the employer and the annuity provider that they had no role in selecting. Compl. ¶ 30.

Historically, such drastic ejections were the exception, not the rule, for ERISA defined benefit plans. Such actions were extremely rare in the decades following ERISA's enactment but have increased in the past

decade and a half. *See* Compl. ¶¶ 27-29; Sven Klingler, Suresh Sundaresan & Michael Moran, *Corporate Pension Risk Transfers*, Management Science – *Articles in Advance* (Aug. 2025), at 1; 5-6. Nevertheless, there are indications that even more companies are planning to undertake such annuity transactions in the future, and the trend appears to be accelerating. Compl. ¶ 29. The main reasons are twofold: First, ejecting employees from a plan allows employers to avoid ERISA's stringent requirements and keep any excess pension funds for themselves after purchasing an annuity. *See* Compl. ¶¶ 3-4. Second, such ejections allow employers to decrease the volatility to which benefit plans are subject, because they have moved the risk of a market drop to the annuity provider.

But there is no such thing as a free lunch. In addition to stripping employees of the protections described above, such terminations are often economically unsound because they carry hidden costs. *See* Serge Agres & Jacob Goldberg, *Pension Risk Transfers Have Several Downside Risks for US Plan Sponsors* (Mar. 2022) [available at https://www.cambridgeassociates.com/insight/pension-risk-transfers-have-several-downside-risks-for-us-plan-sponsors/]. And to the extent an

employer desires to invest in an annuity because of its perceived safety and predictability, nothing in ERISA prevents investing defined-benefit plan assets in annuities *without* ejecting employees from their ERISA plan. *See Trustees of Laborers' Local No. 72 Pension Fund v. Nationwide Life Insur. Co.*, 783 F. Supp. 899 (D.N.J. 1992).

### 3. The Collapse of Executive Life and the Pension Annuitants Protection Act of 1994

Fundamental to understanding the statutory mechanism ERISA contains to protect ejected pensioners is 1991 collapse of the prominent annuity provider, Executive Life.

In the 1980s, Executive Life was an investment darling. It held an A+ rating for financial soundness in 1982, attracting over 300,000 policyholders by 1991 who relied on it for regular payments. Compl. ¶ 35. Unfortunately for its policyholders, Executive Life was stuffed to the gills with "risky junk bonds with high interest rates." Compl. ¶ 36. Despite its nominal A+ rating, Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry standard 24%. Compl. ¶ 36

In September 1989, a group of former Pacific Lumber Company employees sued alleging their employer had violated its fiduciary duties to them when it dissolved their pensions and replaced them with risky

Executive Life annuities. *Kayes v. Pacific Lumber Co.*, 51 F.3d 1449 (9th Cir. 1995). At the time they filed suit, Executive Life had not missed any payments to the beneficiaries. *See Kayes v. Pacific Lumber Co.*, CV-89-3500-TEH (N.D. Cal.) Dkt. 1 (filed Sept. 25, 1989). A full year later, the National Association of Insurance Commissioners (NAIC) published its findings claiming that Executive Life's California and New York insurers were not in "imminent financial danger." Compl ¶ 37. Events would prove this rosy prognostication wrong. In response to those voicing concern about its risky business arrangements, Executive Life noted that it held "impeccable" ratings from major ratings agencies, including an A+ from AM Best and an AAA from Standard & Poors. Compl. ¶ 37.

In truth, Executive Life was coming apart at the seams. By April 1991, regulators in California and New York had seized subsidiaries of the company because they were insolvent. Compl. ¶ 38. But the regulators were too late. Just weeks later, the parent company, Executive Life, filed for bankruptcy. Compl. ¶ 38. Policyholder damages were estimated at $3.9 billion. Compl. ¶ 35. Hundreds of thousands of people lost retirement benefits. Compl. ¶¶ 33-38; Slip Op. 5; *see also Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 293 (5th Cir. 2000). The failure of

Executive Life had a profound impact on American retirees; contemporary accounts describe it as a "tragedy," "scandal," "disaster," and "crisis," *Oversight Hearing on the Effect on Plan Participants of Insurance Company Failures: Hearing Before the Subcommittee on Labor -Management Relations of the Committee on Education and Labor, H. Rep.*, 102d Cong. 26 (July 25, 1991) (Statement of Congressman Charles A. Hayes).[2]

Perversely, although Pacific Lumber had ejected its retirees from their pension plan and bought them the risky Executive Life annuity, its retirees were told they could not sue because they were no longer participants in the ERISA plan. *See Kayes*, 51 F.3d at 1454-55. Consequently, from the ashes of the Executive Life debacle, Congress amended ERISA to protect retirees from the transformation of their pensions into risky annuities. Congress explicitly sought to provide a

---

[2] Lockheed offers a selective view of economic history, stating that "*In the last three decades*, no retiree has lost a single penny in benefits as a result of an annuity buyout transaction." Lockheed Br. 8 (emphasis added). But the "last three decades" metric starts *immediately after* the Executive Life meltdown. Such an analysis is comparable to stating that "in the past 15 years, no large investment bank has failed," because 15 years avoids the 2008 collapse of Lehman Brothers. In any case, as described above, such ejectment transactions have only become relatively common within the past decade.

right of action for plan beneficiaries when "annuities were purchased from annuity providers that had offered the lowest price but that were not, by objective criteria, the safest available annuity provider." *See Recent Court Decisions Affecting ERISA and Executive Life Annunities: Hearing Before the Subcomm. On Labor of the Comm. On Labor & Human Resources*, 103 Cong. 7, S. 1312, S. Hrg. 103-443 (1994) ("S. Hrg. 103-443"). Because such purchases of risky annuities "amount[ed] to a violation of the fiduciary obligations of ERISA," the legislation sought to ensure that pensioners could be made "whole for any *diminution in the value of benefits* that result[s] from the violation." *Id.* (emphasis added).

After careful review of the matter, Congress passed the Pension Annuitants Protection Act of 1994, Pub. L. 103-401, 108 Stat. 4172 (1994) (codified at 29 U.S.C. § 1132(a)(9)). That law ensured that plan participants, like the Pacific Lumber employees in *Kayes*, could sue when their employers breached their fiduciary obligation by selecting an annuity provider that was risky and not in the participants' best interest. One hearing witness testified, "[t]he problem that we have seen quite often is a lack of standing." S. Hrg. 103-443 at 25. Congress therefore expressly amended ERISA to provide employees a right of action against

12

employers' violations in the "event that the purchase" of an annuity violated ERISA's fiduciary requirements. *See* Pub. L. 103-401 §§ 2, 4 ("individuals . . . [may] bring a civil action . . . in the event that the purchase of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant . . . constitutes a violation of [subtitle] 4 of this title . . . by a fiduciary. . . .").

The Pension Annuitants Protection Act thus engraved into ERISA Congress's judgment that retirees may seek redress for the transformation of their pensions into risky annuities the moment that transformation occurs, before the retirees have suffered pocketbook loss. 29 U.S.C. § 1132(a)(9) (empowering plaintiffs to seek forward-looking relief, such as the "posting of security," to "assure receipt" of the amounts "provided *or to be provided* by such insurance contract or annuity") (emphasis added).

Following the Pension Annuitants Protection Act, the Department of Labor issued Interpretive Bulletin 95-1, 29 C.F.R. § 2509.95-1 (1995) ("IB 95-1"), providing that employers who replaced pensions with annuities (absent circumstances not relevant here) must engage in a process designed to obtain the "safest annuity available." *Id.* at

§ 2509.95-1(c). The Bulletin further provided that "reliance solely on ratings provided by insurance rating services would not be sufficient to meet this requirement," and listed at least six separate factors a fiduciary should consider, including the "quality and diversification of the annuity provider's investment portfolio," "the level of the insurer's capital and surplus," and the "lines of business of the annuity provider and other indications of an insurer's exposure to liability." *Id.*

## B. Allegations of the Complaint

Pensioners were participants in and beneficiaries of Lockheed Martin's defined pension plans. Compl. ¶ 1. Since 2021, Lockheed Martin has offloaded $9 billion in pension obligations and ejected 31,000 employees from its pension plans, including Pensioners and others like them. Compl. ¶ 3. Because of this ejection, Pensioners lost all of their ERISA protections, Compl. ¶ 30, including federal insurance provided by the Pension Benefit Guarantee Corporation (PBGC), and must rely—at best—for any potential relief on inferior state guarantee associations ("SGAs."). Compl. ¶ 30. Unlike the funded PBGC, SGAs have no pre-funding and usually have a low limit of "$250,000 in present value of

14

annuity benefits" per participant, which can be exhausted in mere years after an insurer's insolvency.  Compl. ¶ 32.

In addition, Lockheed failed to purchase for Pensioners anything resembling the "safest annuity available"; instead, it bought the riskiest annuity on the market.  Compl. ¶ 55.  Lockheed forced Pensioners into an arrangement with Athene, a private equity-controlled insurance company with a "highly risky offshore structure . . . substantially riskier than numerous traditional annuity providers."  Compl. ¶¶ 3-4.  "By transferring Plaintiffs' pension benefits to Athene, Lockheed Martin put its employees' future retirement benefits at substantial risk of default— a risk for which they were not compensated and which devalued their pensions."  Compl. ¶ 4.  Because neither the returns nor the lower cost associated with such a transaction benefits Pensioners, these considerations do not justify departing from the normal rule that the chosen annuity must be the safest available.

Pensioners have alleged ample facts to support Athene's "substantial risk of default."  First, because of the "increased use of complex investment strategies," private-equity owned insurers like Athene now carry more "high-risk, high-yield investment[s]" on their

books.[3]  Compl ¶ 45.  Although that makes "PRT transactions seem competitively attractive" to employers looking to reduce their pension costs, studies show that "private-equity returns are not better than those for index funds after fees."  Compl. ¶ 45.

Second, Athene's surplus  (the difference between its assets and its annuity obligations) was "exceedingly small," meaning that "only a small percentage of Athene's investments need sour before the state is legally empowered to step in, hearkening back to the Executive Life disaster." *See* Slip Op. 19, citing Compl. ¶ 54; Gober Decl. at 12-13 (ECF No. 35-3). Although Lockheed attempts to make a fiscal mountain out of this surplus molehill, *see* Lockheed Br. 16, 33, 35, 43, 57, the Complaint alleges that when Athene's paltry surplus vanishes (as is likely in a sustained economic downturn, particularly in the bond market) retirees will immediately miss payments. Slip Op. 19.

---

[3] Lockheed asserts on appeal that "assets used to fund benefits are 'ring-fenced' in a separate account, so they are insulated from Athene's general liabilities and cannot be reached by Athene's general creditors." Lockheed Br. 10.  But as discussed *infra* 61-63 there is no evidence that statement is true; Pensioners have had no opportunity to assess its veracity, and have strong reasons to doubt it and its significance to the riskiness of the Athene annuities.

16

Third, Athene is the lineal descendant of Executive Life: it was founded by Apollo executives as an insurance affiliate, Compl. ¶ 46; Apollo itself was founded on the scavenged remains of Executive Life, Compl. ¶ 35; and its executives contributed to the collapse of Executive Life in the first place. Compl. ¶ 46.

Fourth, Athene relies on an "offshore captive reinsurer headquartered in Hamilton, Bermuda," where "capital requirements are lower than insurers, investment limitations virtually non-existent, and transparency is minimal to zero." Compl. ¶ 48.[4] Forensic analysis by Tom Gober, a Certified Fraud Examiner, revealed a string of "circular transactions between Athene and both its offshore and U.S. affiliates total[ling] $115.7 billion in 2021." If "only a fraction" of that nominal reinsurance failed, "Athene would face a funding shortfall." Compl. ¶ 51.

Fifth, industry experts have recognized that "the mission of private equity does not align with the best interests of policyholders," because "private equity firms' focus is on maximizing their immediate financial returns, rather than ensuring that promised retirement benefits are

---

[4] Reinsurance is the process by which insurers obtain guarantees of *their own* obligations. It is a critical indicator of the safety of an insurance policy. *See* Compl. ¶ 51.

there at the end of the day for policyholders." Compl. ¶ 53. Similarly, the Department of the Treasury has expressed concerns that a "potential misalignment may exist between the shorter term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interest." Compl. ¶ 54.

Finally, the Complaint plausibly alleges that Athene was the rock-bottom, absolute worst-choice annuity available. Compl. ¶ 55. Overall, Athene had a 21% higher risk premium than U.S. Treasury obligations, indicating an approximately one-in-five chance of failure to pay over the life of the annuity. Compl. ¶ 55.[5] Thus, as an independent advisory

---

[5] Lockheed boldly asserts that, "Plaintiffs admit that Athene's credit rating means that it has less than five percent chance of default." Lockheed Br. 17. The supposed basis for this assertion appears to be a citation to the Gober Declaration, *see* Lockheed Br. 37. But the relevant section of that document deals only with Athene Iowa's bonds, making a calculation assuming the facial validity of those bonds' ratings. As discussed *supra*, the ratings agencies also gave Executive Life high ratings until that insurer collapsed. In addition, even if the risk of catastrophe were "only" one-in-twenty, that increase in risk would be a "substantial" increase from the effectively zero risk the Pensioners had prior to Lockheed ejecting them. *See infra* 52-60.

More important, that's not what the Complaint alleges. The NISA analysis—incorporated into the Complaint—shows that Athene has approximately a one-in-five chance of default. Compl. ¶ 55 *citing* David G. Eichhorn, *Pension Risk Transfers May Be Transferring Risk to*

company, NISA Investment Advisors found in a study, Athene is a "QUESTIONABLE CANDIDATE[]" and "DEMANDS EXTENUATING CIRCUMSTANCES" to be chosen as an annuity because of its greatly increased credit risk:

Figure 1: Quantifying Risk of Athene

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

Compl. ¶ 55.

The Complaint presents well-pleaded and plausible facts that the risk of failure for Athene is currently approximately one-in-five (21.4%)

_Beneficiaries_, NISA (Oct. 13, 2022) [available at https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/] ("[P]ut simply, the credit spread on any issuer is the market's assessment _of the likelihood of default_ and the attendant credit losses in that event.") (emphasis added).

over the life of the annuity. Compl. ¶ 55. Pensioners thus went from having a functionally 0% chance of failure before the PRT (because their pensions were funded by plan assets, guaranteed by Lockheed, a Fortune 100 company, and backstopped by federal PBGC guarantees) to at least a 21% chance of failure once they were forced into the risky Athene annuity. *Id.* And these odds will only worsen if an economic downturn occurs or Athene is forced to sell illiquid assets to meet pension obligations, at which point it will be too late to assure the full and uninterrupted pension benefits that Pensioners have earned. *See Doherty*, 2025 WL 2774406, at *6.

Pensioners sued under ERISA, seeking to have their retirement income returned to the security it had before their pensions were transformed into risky annuities—exactly the remedy Congress provided them when it amended ERISA after Executive Life's collapse. Compl. ¶ 74 & Prayer for Relief; 29 U.S.C. § 1132(a)(9) (retirees may sue to "assure receipt" of the "amounts provided or to be provided" by the annuity, including through the "posting of security" by the employer).

## C.    Procedural History

Lockheed moved to dismiss, arguing that the Pensioners lacked an injury in fact necessary for Article III standing. The District Court denied the motion, Slip Op. 1,[6] identifying is as a "facial" challenge, where "the facts alleged in the complaint are taken as true, and the motion must be denied if the complaint alleges sufficient facts to invoke subject matter jurisdiction." Slip Op. 10, *citing Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).[7]

The District Court identified "two ways" the Pensioners "claim to have suffered a cognizable injury": First, Pensioners plausibly allege "an increased and significant risk they will not receive the pension benefits to which they are entitled." Slip Op. 14. Second, they have pled an injury through the "devaluing" of their retirement benefits because those benefits are "less valuable" than they were before Pensioners "were expelled from the Plans." *Id.* The District Court rejected Lockheed's argument that *Thole v. U.S. Bank, N.A.*, 590 U.S. 538 (2000), controls

---

[6] The District Court also denied Lockheed's 12(b)(6) motion, and Lockheed has not challenged that ruling on appeal. *See* Slip Op. 32-37.

[7] The District Court's conclusion that Lockheed's standing challenge was "facial" was correct and, in any event, is not at issue on appeal.

this case, noting that Pensioners alleged both "mismanagement of the plan . . . so egregious that it substantially increased the risk" of failure, and that the removal of ERISA "protection in favor of SGAs" which "offer less protection" constituted injury.  Slip. Op. 17.

Reviewing the complaint, the District Court held that Pensioners had alleged facts "sufficient to conclude there is a 'substantially increased risk' that Athene will fail and Plaintiffs' will suffer harm because of it [and] . . . it appears undisputed that their pensions are no longer guaranteed in full by the PBGC."  Slip Op. 19-20 (emphasis added). Noting that the Pensioners' claims about Athene's risk profile and alleged underfunding "hearken[] back to the Executive Life disaster," the District Court held the Pensioners had suffered injury resulting from the riskiness of the Athene annuity.  Slip Op. 20.

The District Court further held that *Peters v. Aetna, Inc.*, 2 F.4th 199 (4th Cir. 2021), provided an independent basis for Pensioners' standing. In *Peters*, this Court held that "[e]ven if [the plaintiff] failed to demonstrate a financial injury for standing purposes . . . allegations revolving around breach of fiduciary duty would separately provide []standing to pursue claims for surcharge, disgorgement, and declaratory

22

and injunctive relief." *Id.* at 219. In other words, breach of fiduciary duty claims like those here satisfy Article III's standing requirement independent of any financial harm.

Following the District Court's decision, Lockheed requested certification of the ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Dkt. 83. The District Court certified the order, and this Court granted interlocutory review.

## SUMMARY OF THE ARGUMENT

ERISA was created to protect pensioners' retirements and explicitly amended in 1994 to allow retirees to sue "in the event that the purchase of . . . an annuity" constitutes a statutory violation, just as happened here. 29 U.S.C. § 1132(a)(9). Before Lockheed offloaded to Athene the responsibility for Pensioners' retirement benefits, Pensioners faced functionally 0% risk of payment failure, because their retirement benefits were both guaranteed by Lockheed and backstopped by federal insurance. Now, Pensioners have instead face at least a 1-in-5 chance of nonpayment, and a dramatic increase in the risk of a catastrophic outcome.

A.　　"In order to decide whether an intangible harm constitutes an injury in fact, 'history and the judgment of Congress play important roles.'" *Spokeo*, 578 U.S. at 340.　Here, history and the judgment of Congress both support Pensioners' standing. Congress created an explicit right of action for plan beneficiaries, like Pensioners, to sue "in the event that the purchase" of an annuity constituted a fiduciary violation.　29 U.S.C. § 1132(a)(9).　The text, history, and structure of that statute show Congress's intent to allow Pensioners to bring a suit "in the event" of the "purchase," rather than waiting (potentially decades) until they miss promised retirement payments.

B.　　When Lockheed ejected Pensioners from their defined benefit plan and purchased them a risky annuity, Pensioners suffered concrete and immediate harm that qualifies as injury-in-fact for purposes of Article III standing, closely related to harms established at contact law. *See TransUnion*, 594 U.S. at 417 ("Central to assessing concreteness is whether the asserted harm has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts.").

24

First, the dramatic increase in risk from the Athene annuity bears a close relationship to harms recognized at contract law when a promisor improperly assigns performance to an inferior substitute, just as Lockheed improperly assigned performance to risk-addled Athene. Second, the loss of PBGC coverage, the employer's duty to make up plan shortfalls, and the employer's duty to cover pensions even if the plan's assets cannot, independently constitute an injury all but identical to a failure to perform a contract. The loss of these valuable rights and protections, and their replacement with a cut-rate, risky annuity also caused immediate and measurable economic harm to Pensioners for Article III purposes, even before an interruption in their benefits.

C.    Lockheed's fiduciary violations also independently constitute injury. They bear a close relationship to harms traditionally recognized at trust law, even in the absence of a monetary loss, and this Court held in *Peters* that a fiduciary breach, even without financial injury, suffices for standing purposes when making a claim for disgorgement. 2 F.4th at 219. The *Peters* court carefully considered the Supreme Court's ruling in *Thole* (decided a full year before) and properly determined that *Thole* did not disturb this Court's earlier holding in *Pender v. Bank of America*

25

*Corp.*, 788 F.3d 354 (4th Cir. 2015), that "a financial loss is not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA." *Id.* at 219-20.

D.    Pensioners' massive increase in risk of default also constitutes an independent ground for standing because it presents a "substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Before they were ejected, Pensioners had effectively zero risk of failing to receive their retirement benefits. Now, because of Athene's risky offshore transactions, regulatory arbitrage, unsound and illiquid investments, and undercapitalization, Pensioners face a 1-in-5 chance of failing to receive payments: an undoubtedly substantial increase in risk, and one foreshadowed by the Supreme Court in *Thole*. 490 U.S. at 546 (discussing the potential claim for "mismanagement of the plan . . . so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants future pension benefits.").

E.    To the extent Lockheed argues alleged "facts" beyond the Complaint, such assertions are not appropriate when considering its "facial" motion to dismiss, where "the facts alleged in the complaint are

26

taken as true, and the motion must be denied if the complaint alleges
sufficient facts to invoke subject matter jurisdiction." *Kerns*, 585 F.3d at
192. And in any case, Lockheed's improper reliance on facts outside the
Complaint rests on its misleading characterizations of cherry-picked
materials that have not been subject to adversarial testing. Lockheed
will have the opportunity to advance its preferred factual narrative at
summary judgment and trial, after that story has been tested by
discovery. It may not do so now.

## STANDARD OF REVIEW

The Court reviews the denial of a motion to dismiss for lack of
subject matter jurisdiction *de novo*. *Berkley v. Mountain Valley Pipeline,
LLC*, 896 F.3d 624, 629 (4th Cir. 2018).

## ARGUMENT

The dispute here is whether terminating ERISA defined-benefit
pension rights and replacing those rights with a risky Athene annuity is
a "concrete" injury under Article III. Lockheed argues that there can be
no injury because the Athene has *not yet* defaulted and default is not
"certainly impending," Lockheed Br. 32. That is wrong. Congress
protected the right to prevent future loss of retirement income that has a
"close relationship" to harms long recognized under contract and trust

law. Indeed, Congress's decision to permit suits here reflects the right to retirement income security at the core of ERISA. Retirement benefits are intended to last decades; if beneficiaries could only sue upon the cessation of current payments, ERISA's six-year statute of repose would leave Pensioners without recourse for any annuity—no matter how unsafe— that teetered along for half-a-dozen years before defaulting. Such a rule flies in the face of ERISA's basic purpose: protecting plan participants and beneficiaries and ensuring their future retirement payments.

The District Court properly held that harms like those suffered by the Pensioners qualify as a concrete injury for purposes of Article III. *Accord Spokeo*, 578 U.S. at 340 ("Although tangible injuries are perhaps easier to recognize, . . . intangible injuries can nevertheless be concrete."). "In order to decide whether an intangible harm constitutes an injury in fact, 'history and the judgment of Congress play important roles.'" *Dreher v. Experian Information Solutions, Inc.*, 856 F. 3d 337, 344 (4th Cir. 2017) (quoting *Spokeo).* Congress's clear determination to allow these suits is fully consistent with injuries long recognized under contract and trust law. "Central to assessing concreteness is whether the asserted harm

has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 594 U.S. at 418.

Rather than focus on the Supreme Court's *TransUnion* test, Lockheed misreads *Thole* to create a special rule for pensions, limiting standing only to when monetary loss has already occurred or is "certainly impending." Lockheed Br. 14. But "[t]here is no ERISA exception to Article III." *Thole*, 590 U.S. at 547. The *Thole* plaintiffs lacked standing because their claims were (1) for losses to assets of the existing pension plan; (2) they had no individual right to those pension assets; (3) their pensions were secured by the employer's duty to pay the pensions; and (4) the PBGC provided insurance if plan assets fell short. *Id.* at 543-45.

That is the opposite of the situation here. Pensioners (1) have been forced out of their pension plan; (2) have an individual interest in their individual retirement payments; (3) their employer has no obligation to pay if assets run short; and (4) have lost PBGC coverage and ERISA's federal protections. Put simply, *Thole* cannot support Lockheed's argument because the *Thole* plaintiffs remained participants in their plans after the alleged breach and were not ejected from ERISA's protective regime, and the suite of rights and benefits that entails—

29

exactly what has been taken from Pensioners here. Pensioners are seeking to enforce their own rights and Lockheed's fiduciary obligations *to them*—not to the plan.

Nothing in *Thole* implies that the termination of the employer's duty and the statutory protections that go with it (as in this case) and the purchase of a risky substitute does not constitute an injury. Just the opposite: the *Thole* Court's reliance on the ERISA protections that Pensioners have lost in this case underscores the injury here. Beyond that, the *Thole* Court recognized the possibility, urged by the United States as *amicus curiae*,[8] that a shortfall in the plan might be a sufficient injury "if the mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail and be unable to pay the participants' future pension benefits."

---

[8] Perplexingly, the Secretary of Labor appears to have abandoned the United States' longstanding position without providing any reason for doing so, and elides its about face behind an oblique reference to "plaintiffs' amici" in *Thole*, Amicus Curiae Brief of the U.S. Sect'y of Lab. in Support of the Appellant at 15, *Konya v. Lockheed Martin Corp.*, No. 25-2061 (4th Cir. Jan. 9. 2026) ("DOL Br."), neglecting to mention that critical among those "amici" was the United States itself. *See* Brief for the United States as Amicus Curiae Supporting Petitioners at 20, *Thole v. U.S. Bank, N.A.*, 590 U.S. 538 (2020), No. 17-1712.

30

590 U.S. at 546. Such mismanagement didn't exist in *Thole*, but it does here. Pensioners thus possess all the qualities that the *Thole* Court found lacking in that case, and have standing under Article III to enforce their ERISA rights. Congress did not exceed its constitutional authority when it empowered Pensioners to sue under these circumstances.

## A.    ERISA Explicitly Allows Pension Beneficiaries to Sue When an Employer Purchases a Risky Annuity

One of ERISA's "central purposes" is "to prevent the 'great personal tragedy' suffered by employees whose vested benefits are not paid when pension plans are terminated." *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374 (1980) (footnote omitted). Central to the statutory scheme is ERISA's imposition of twin duties of loyalty and prudence on plan fiduciaries that are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) (Friendly, J.)). Under the duty of loyalty, an ERISA fiduciary must "discharge his duties . . . solely in the interest of the participants and beneficiaries. . . ." 29 U.S.C. § 1104(a)(1). The duty of prudence requires a fiduciary to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like

capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." *Id.* § 1104(a)(1)(B).

Congress expressly declared ERISA's "policy" to be "to protect . . . the interests of participants in employee benefit plans and their beneficiaries . . . by providing for appropriate remedies, sanctions, and ready access to the Federal courts."  29 U.S.C. § 1001(b); *see Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 44 (1987).

Given limited resources, the Secretary of Labor and Solicitor General of the United States have previously stated that the Government "cannot monitor every plan in the country," and therefore the "*best* means of protecting individual pension rights [is] to authorize beneficiaries to sue fiduciaries who breach their duties, notwithstanding resulting litigation cost."  Brief for the United States as Amicus Curiae Supporting Petitioners at 26, *Thole v. U.S. Bank, N.A.*, 590 U.S. 538 (2020), No. 17-1712 (emphasis in original). The Department of Labor's ability on its own to protect retirement income is no stronger now than it was in 2020.

Congress relied on plan participants' and beneficiaries' private access to the courts in the Pension Annuitants Protection Act of 1994. There, Congress amended ERISA to explicitly give pensioners the ability

32

to sue "*in the event that the purchase* of an insurance contract or insurance annuity in connection with termination of an individual's status as a participant covered under a pension plan" violated a fiduciary duty. 29 U.S.C. § 1132(a)(9) (emphasis added). Section 2 of the Act is titled: "Civil Enforcement of ERISA." *Id.* Similarly, the relevant Section of the United States Code, 29 U.S.C. § 1132(a), is titled: "Persons empowered to bring a civil action." The title of the statute thus makes clear its purpose: to allow private suits to enforce ERISA protections. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 704 (2025) (In an ERISA case, holding that "the title of a statute and the headings of a section are tools available for the resolution of a doubt about the meaning of a statue.*"*). Lockheed would rewrite this section to erase Congress's clear triggering language and substitute its own preferred legislative fix.

Under Lockheed's new statute, the law would allow suits only "*in the event of default* of an insurance contract or insurance annuity *that makes retroactively clear a fiduciary violation occurred years prior*." But that is not what Congress wrote. Congress was concerned with injuries that occurred at the time of "purchase," not at the time of 'default.' The proposed rewrite also contradicts the relief offered in the same provision,

which includes "the posting of security if necessary, *to assure receipt* by the participant or beneficiary of the amounts provided *or to be provided* by such insurance contract or annuity[.]"    29 U.S.C. § 1132(a)(9) (emphases added).  Such prospective relief "to assure receipt" of amounts "to be provided" makes no sense if the statute applies only after default has occurred and payments have been lost.

This plain reading of the text comports with the history of the 1994 statute, enacted in the wake of the Executive Life debacle.  Like Athene today, Executive Life held  ratings suggesting its financial soundness at the time annuities were purchased, even though it was replete with risky investments.  Compl. ¶ 36.  Like Athene, dozens of companies purchased the cut-rate annuities from Executive Life to make themselves a profit.  S. Hrg. 103-441 at 1 (Statement of Sen. Howard W. Metzenbaum).  And, as with Athene today, individuals sued before Executive Life missed any payments, though at the time those suits were unsuccessful.  *See Kayes*, 51 F. 3d at 1449.  To prevent similar future catastrophes, Congress expressly amended ERISA to provide employees a right of action against employer's violations in the "event that the purchase" of an annuity violated ERISA's fiduciary requirements.  Pub. L. 103-401.

34

*TransUnion* emphasized that "Courts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." 594 U.S. at 425. That is precisely what happened here. After careful deliberation, Congress created a statutory right for employees to sue "in the event that the purchase" of an annuity constituted a fiduciary breach.

This plain reading of Section 1132(a)(9) is also consistent with ERISA's overall structure. ERISA's statute of repose period runs from the date the annuity was purchased, not the date payments stop. *See* 29 U.S.C. § 1113(1) ("No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility . . . after the earlier of—six years after (A) the date of the last action which constituted a part of the breach or violation."). And, as its name suggests, ERISA as a whole is designed to *secure* retirement benefits, because uncertainty is itself harmful to employees who must plan for retirement. *See* 29 U.S.C. § 1001b(a)(2)-(3).

To be sure, Congress does not have *carte blanche* to create rights whose violation alone constitutes Article III injuries. *See TransUnion*,

35

594 U.S. at 427. But as discussed below, the right to sue that Congress created to protect retirement income security corresponds to injuries long recognized as justiciable under contract and trust law.

## B. Pensioners Suffered a Concrete Injury Comparable to Those Long Recognized at Contract Law

As the Supreme Court noted in *Thole*, a defined benefit plan can be viewed "in the nature of a contract." 590 U.S. at 542-43; *see also Nachman*, 446 U.S. at 370 (discussing that "employees' benefits are 'vested in a contractual sense.'"). In exchange for the Pensioners' years of work for Lockheed, Lockheed promised to provide an ERISA-covered defined benefit plan, which included, among other things, valuable federally protected rights. *See* Compl. ¶¶ 30-32, 57. ERISA sets out the mandatory terms of such a contract, requiring employers like Lockheed to meet federal standards for funding and vesting (among other things), and to backstop the plan with federal insurance. *See* 29 U.S.C. §§ 1082-83 (funding rules); § 1053 (vesting standards); § 1321, *et seq.* (mandatory insurance).

Lockheed, acting as both plan sponsor and administrator, ejected Pensioners from the ERISA plan, dissolved their pensions, and substituted risky Athene annuities. Lockheed's actions thus injured

36

Pensioners by giving them less than they bargained for. In addition, when Lockheed ejected Pensioners from their plan, Pensioners lost a panoply of valuable protections, including PBGC insurance coverage. *See Doherty*, 2025 WL 2774406, at * 7-8. The losses of these rights are all but indistinguishable from harms long-recognized in the contract context, and therefore more than sufficiently concrete to confer standing under Article III. *See TransUnion*, 594 U.S. at 417. And contrary to Lockheed's argument, the fact that ERISA permits *some* voluntary plan terminations doesn't mean that the loss of ERISA protections isn't injury. Not all injuries are unlawful. *See Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001). This one is.

### 1. Lockheed's Selection of the Riskiest Possible Annuity Constitutes a Harm Comparable to Improper Delegation at Contract Law

Pensioners' injury parallels contract law in another respect. Lockheed and Pensioners had an agreement: in exchange for years of service, Lockheed would provide Pensioners with a secure defined benefit retirement plan, which had a functionally zero percent chance of default. *See* Compl. ¶ 9. Now, Lockheed has replaced its own obligation with a cut-rate annuity. The harm to Pensioners from that substitution

constitutes an injury analogous to improper delegation of performance at contract law.

Contract law has long been clear that "[a] contractual right can be assigned *unless the substitution of a right* of the assignee for the right of the assignor would . . . *materially increase the burden or risk* imposed on him by his contract, or materially impair his chance of obtaining return performance, or materially reduce its value to him. . . ." Restatement (Second) of Contracts § 317(2)(a) (1981). That is precisely what happened here: Lockheed substituted its performance for Athene's, and "materially increase[]d the burden or risk." *Id.* In so doing, Lockheed substituted something of lower quality for what the contract promised. *See Virginia Elec. & Power Co. v. Bransen Energy, Inc.*, 850 F.3d 645, 648-651 (4th Cir. 2017) (upholding breach of contract action when supplier promised to deliver a "high-quality" coal product and instead delivered, among other things, "garbage of bituminous" coal).

By analogy, a creditworthy debtor cannot avoid a contractual repayment obligation by delegating responsibility for debt payment to a party with dubious finances, yet that is exactly what Lockheed has done here. A change to the creditworthiness of an obligor—here from

Lockheed, an industrial and technological behemoth with a market capitalization of over $100 billion backed by federal insurance, to Athene, a far less credit-worthy obligor—has always been viewed by courts as an Article III injury.  The Supreme Court underscored this in *Gollust v. Mendell*, 501 U.S. 115, 127 (1991), holding that in a claim for short-swing profits by a company insider,  "the indirect interest derived through one share of stock is enough to confer standing, however slight the potential marginal increase in the value of the share. A bondholder's sufficient financial interest may be even more attenuated, since any recovery by the issuer will increase the value of the bond *only because the issuer may become a slightly better credit risk*." (emphasis added).   Yet that bondholder's interest in improving issuer credit was held sufficient to satisfy Article III.

Likewise, the Supreme Court has upheld a Contract Clause challenge to the retroactive repeal of a bond covenant protecting the issuer's revenues.  "As a security provision, the covenant was not superfluous; it limited the Port Authority's deficits and thus protected the general reserve fund from depletion.  Nor was the covenant merely modified or replaced by an arguably comparable security provision.  Its

outright repeal totally eliminated an important security provision and thus impaired the obligation of the States' contract." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 19 (1977). An unconstitutional impairment of contract necessarily implies a contractual injury in the form of a reduction in the creditworthiness of the bonds. The bondholders did not have to wait for default.

Lockheed (Lockheed Br. 27) cites *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004), but that case helps Pensioners, not Lockheed. *Till* demonstrates that not all promises to make a stream of future payments are created equal. In that case, the Supreme Court stated that a creditor who could not seek a higher interest rate to reflect a greater risk of non-payment would fail to receive their rightful "present value," 541 U.S. at 483. Similarly, Pensioners are injured by Lockheed's swapping its own obligations (with PBGC backing) for Athene, where Pensioners bear increased risk but do not benefit from a lower purchase price (which inures to Lockheed) or higher potential returns on plan assets (which help only Athene).[9]

---

[9] When the plan participant will receive a "substantial share of the cost savings," IB 95-1 notes that the analysis regarding the annuity purchase may be different. *See* 29 C.F.R. § 2509.95-1(d) (1995).

Pensioners' injury is set in even sharper relief when considering ERISA's exacting fiduciary standard that requires fiduciaries to act "solely" in the interest of participants, 29 U.S.C. § 1104(a), and 29 C.F.R. § 2509.95-1, which explains that companies like Lockheed should thus work to purchase the "safest annuity available." *Id.* at § 2509.95-1(c). *See* Lockheed Br. 53-54 (referencing the "strict oversight" for such transactions, the requirements of 29 C.F.R. § 2509.95-1, and noting that the "guidance . . . has proven effective.").[10]  But far from anything remotely resembling the "safest" annuity available, Lockheed purchased the *riskiest* annuity available. *See* Compl. ¶ 55. There is no question that in the analogous contract situation, such actions would constitute breach and standing would be a given.  *See* Restatement (Second) of Contracts § 317(2)(a) (1981).

Lockheed argues that under this theory, "any time a plaintiff who is owed a future payment alleges a risk of nonpayment, that would be

---

[10] The Secretary of Labor as *amicus curiae* urges this Court to "clarify" (*i.e.,* change) this longstanding interpretation of IB 95-1.  *See* DOL Br. 23.  Because Lockheed has not challenged IB 95-1 on the merits, that issue is not properly before the Court. And regardless of IB 95-1, the Athene annuity is patently unsafe.

enough to plead a past, actual harm—even though, if the risk does not materialize, no actual harm will have occurred." Lockheed Br. 27. Not so. Here, the Complaint pleads an injury traceable to Lockheed's action in removing Pensioners from the plans and purchasing risky annuities, not just that there is a risk of non-payment. *See* Compl. ¶ 30. And of course, not every injury gives rise to a viable claim that a statutory duty was breached. Lockheed has not challenged the District Court's ruling that the complaint in this case states such a claim. *See* Slip Op. 32-37.

Lockheed argues, in the alternative, that because the beneficiaries "cannot sell their [pension] benefits" there can be no change in the market value of their asset. Lockheed Br. 28. But alienability does not control value. A reduction in future Social Security benefits would be injury although the benefits are inalienable. *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 688 (1979) (discussing challenges to future recoupment of Social Security benefits). Nor does the absence of a market dictate the absence of an injury. Selling bodily organs is illegal in the United States, 42 U.S.C. § 274e, but an individual can bring a lawsuit when their eye gets poked out. *See Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451 (7th Cir. 2020). Indeed, Courts routinely find standing for injuries for

42

which no market or right of alienability exists. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Environmental Svcs., Inc.*, 528 U.S. 167 (2000) (standing for harm to publicly-available waterway); *Toll Brothers, Inc. v. Township of Readington*, 555 F.3d 131, 140 (3d Cir. 2009) (finding standing when plaintiff has an unexercised option to personally purchase a parcel at a specific price). *Thole* itself contradicts Lockheed's assertion, because it entertains the possibility of standing when "mismanagement of the plan was so egregious that it substantially increased the risk that the plan and the employer would fail. . . ." 590 U.S. at 546.

### 2. The Loss of Valuable Benefits, Including PBGC Coverage, Constitutes an Injury Comparable to Failure to Perform at Contract Law

Just as a party to a contract may sue over a breach without having yet experienced a monetary loss—because the impairment of a contractual right is an injury—the ejectment of Pensioners from a plan protected by the employer's guarantee and PBGC insurance corresponds to a traditional injury at contract law. When Pensioners were stripped of their ERISA benefits, including PBGC insurance, they suffered an immediate "concrete" injury qualifying as a harm under Article III. That

43

harm bears a "close relationship" to the harm an individual with a contract suffers when a counterparty delivers an inferior commodity.

"[A]ll else being equal—an agreement or contract for monthly payments with a panoply of robust protections and guarantees is objectively more financially valuable than a contract for the same monthly payments with unambiguously weaker protections and guarantees." *Doherty*, 2025 WL 2774406, at *7. ERISA protections are valuable, and Pensioners were injured when they lost them.

Consider the different posture of employees before and after their ejection from the plan. "Upon purchasing annuities, the employer is no longer subject to ERISA's multitudinous requirements . . . [a]nd the PBGC is likewise no longer liable for deficiency in the event the plan becomes insolvent. . . ." *Beck*, 551 U.S. at 96. Under ERISA, "the employer, not plan participants, is on the hook for plan shortfalls." *Thole*, 590 U.S. at 543. By contrast, after Lockheed ejected them from the plan, Pensioners are on the hook for shortfalls by Athene. Compl. ¶¶ 3-4, 25. Under ERISA, "about the last thing a rational employer wants or needs is a mismanaged retirement plan." *Thole*, U.S. at 545. If Lockheed is correct and Pensioners have no standing to challenge an annuity

44

purchase, employers will have every incentive to pick a riskier (and cheaper) annuity because they get to pocket the difference between plan assets and the annuity purchase price. Compl. ¶¶ 4, 27.

Under ERISA, if the plan were to fail, "PBGC by law acts as a backstop and covers the vested pension benefits up to a certain amount and often in full." *Thole*, 590 U.S. at 546, n.2. Now, employees have only state guaranty association ("SGA") protections, which lack pre-funding and offer substantially lower coverage for beneficiaries than the PBGC. Compl. ¶¶ 31-32. Under ERISA, the fiduciary duty owed pensioners is the "highest known to the law." *Tatum*, 761 F.3d at 355-56. Now, "Athene does not owe stringent fiduciary duties meant to safeguard [pensioners'] retirement." *Doherty*, 2025 WL 2774406, at *8. Under ERISA, pensioners had a federal cause of action for breach; now, they are limited to state law remedies. *Beck*, 551 U.S. at 106. Under ERISA, pensioners could rely on the Department of Labor to "aggressively pursue financial misconduct," *Thole*, 590 U.S. at 545; now, they have to "expend time and resources monitoring Athene and filing a claim should the need arise." *Doherty*, 2025 WL 2774406, at *8. These differences are summarized below:

*Table 1: Loss of Protections and Guarantees*

|  | *Before Ejection from Plan* | *Now* |
|---|---|---|
| Responsibility for Shortfalls | Lockheed | Athene/Employees |
| Incentive to Mismanage | Low | High |
| PBGC Insurance | Yes; pre-funded and "often in full" | No |
| Fiduciary Duty | "Highest known to the law." | None |
| Cause of Action | Federal | State |
| Oversight | Department of Labor | No federal oversight |

The loss of any of these rights, standing alone, is injury. Lockheed removed a "panoply of robust protections and guarantees" and replaced them with "a contract for the same monthly payments with unambiguously weaker protections and guarantees." *Doherty*, 2025 WL 2774406, at *7.

To illustrate, consider if a new Department of Labor regulation were to strip away any (much less all) of these protections, for example, removing a pensioner's PBGC protections. There is no doubt those pensioners would have standing to challenge that regulation. The analysis here is no different.

Or consider another context where a loss of insurance coverage constitutes Article III injury. Under Title VII, removing an employee's insurance on a wrongful basis is an Article III harm. *See*, *e.g.*, *Lange v. Houston County, Georgia*, 152 F.4th 1245, 1251 (11th Cir. 2025) ("[I]f an employer provides health insurance, its policy cannot discriminate based on a protected characteristic."); *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 683 (1983) ("[I]f a private employer were to provide complete health insurance coverage for the dependents of its female employees, and no coverage at all for the dependents of its male employees, it would violate Title VII."). The same is true for wrongful denial of term life insurance. *See* 29 C.F.R. § 1604.9(a) (defining "fringe benefit" to include "life insurance"). Were an employer to deny an employee such term life insurance on the basis of race, the employee would be injured and have standing to bring a lawsuit; they would not have to wait until they died (or show a high probability that their demise was "certainly impending," Lockheed Br. 14). The same is true of PBGC insurance: it is a valuable benefit, the deprivation of which constitutes injury.

The loss of these valuable rights, including PBGC insurance, differentiates Pensioners from the *Thole* plaintiffs, who were never ejected from their ERISA plans and who retained ERISA's protections. In *Thole*, if the plaintiffs won, "they would still receive the exact same month benefits they are already entitled to receive." 590 U.S. at 538, 541. But here, if the Pensioners win and are permitted to obtain appropriate relief, they will plainly be in a different and much improved position.

## C. Lockheed's Fiduciary Violation Bears a Close Relationship to Harms at Trust Law

In addition, Lockheed's breach of fiduciary duty bears a close relationship to harms at trust law, and this Court's precedent, including in *Peters v. Aetna*, 2 F.4th 199 (2021), recognizes that a fiduciary breach, even without monetary loss, creates standing for claims of equitable relief in the form of disgorgement. *See id.* at 219 ("a financial loss [is] not a prerequisite for standing to bring a disgorgement claim under ERISA."). Rather, as here, plaintiffs have "standing to maintain [their] claims for surcharge, disgorgement, and declaratory and injunctive relief based on [their] allegations of breach of fiduciary duty." Slip Op. 22. As this Court noted, holding otherwise would allow wrongdoers to "profit from their unlawful acts as long as the wronged party suffers no financial loss." *Id*.

48

That is precisely what Lockheed proposes here, and what this Court rejected in *Peters*.

In response to this controlling Fourth Circuit holding, Lockheed first argues that the *Peters* holding is *dicta*. Lockheed Br. 49-50. It's not. The Court began its discussion by noting that "[e]ven if *Peters* failed to demonstrate a financial injury for standing purposes as to the restitution claim, her allegations revolving around breach of fiduciary duty would *separately provide her standing. . . .*" *Peters*, 2 F.4th at 219 (emphasis added). Alternative holdings are not dicta. *See Gestamp South Carolina, L.L.C. v. N.L.R.B.*, 769 F.3d 254, 262 n.4 (4th Cir. 2014) ("alternative holdings are not dicta"); *MacDonald, Summer & Frates v. Yolo County*, 477 U.S. 340, 346 n.4 (1986) ("since the [Court] did not rest its holding on only one of its two stated reasons, it is appropriate to treat them as alternative bases of decision.").

Next, Lockheed argues that this Court in *Peters* somehow overlooked the Supreme Court's holding in *Thole* that issued a full year earlier. *See* Lockheed Br. 51 ("*Peters* does not mention *Thole*, much less attempt to explain how it is consistent with that decision—and it is not."). But the Supreme Court decided *Thole* on June 1, 2020. 590 U.S. 538

(2020).  Ten days later, the Appellee in *Peters*, Aetna, promptly brought the decision to the Fourth Circuit's attention via a Rule 28(j) letter, and argued (unsuccessfully) that the Supreme Court "rejected the argument—pressed by Peters on appeal—that a plan participant or beneficiary can pursue a fiduciary claim on her plan's behalf regardless of whether she personally suffered monetary harm." Appellees' Rule 28(j) Letter of Supplemental Authority at 2, *Peters v. AETNA, Inc.*, No. 19-2085 (4th Cir. 2021), Dkt. 55.  Oral argument was held months later, and the final opinion was published a year after *Thole*.  A month later, Aetna applied for *en banc* review, claiming that the panel's "holding that Peters 'need not demonstrate a financial loss' to establish Article III standing for her claims for disgorgement, surcharge, declaratory relief, and injunctive relief . . . conflicts with the Supreme Court's recent decision[ ] in *Thole*. . . ." *Id.*, Dkt. 94 at 3.  The Fourth Circuit rejected the petition two weeks later.  *Id.*, Dkt. 96.  The Supreme Court subsequently denied *certiorari*.  142 S. Ct. 1227 (Mem.) (2022).  Far from being the product of an accidental oversight, this Court considered—and rejected—the exact argument made by Lockheed, that *Thole* somehow conflicts with *Peters*. *See* Lockheed Br. 51.

Next, Lockheed argues that *Peters* should not apply because it concerns ERISA-covered "healthcare plans," not pension plans. Lockheed Br. 50. But Lockheed provides no persuasive rationale for this distinction, because none exists. For starters, *Peters* relied heavily and explicitly on *Pender v. Bank of America Corp.*, 788 F.3d 354 (4th Cir. 2015). *See Peters*, 2 F.4th at 219 ("*Pender* guides our analysis here"). And *Pender* did not concern a healthcare plan; it dealt with retirement plans. 788 F.3d at 358. *Pender* held that "a financial loss [was] not a prerequisite for [Article III] standing to bring a disgorgement claim under ERISA." *Id.* at 365-66. And *Peters* held this "precept was fundamental in the disgorgement context. . . ." 2 F.4th at 219-20.

The holdings of *Pender* and *Peters* are not doctrinal outliers. Rather, they comport with the long-established no further inquiry rule allowing suits for equitable remedies for breach of fiduciary duty in the absence of monetary loss. *See* Restatement (Second) of Trusts § 170(1) & cmt. b. This rule is of ancient lineage. *See, e.g.*, *Davoue v. Fanning*, 2 Johns. Ch. 252*,* 261 (N.Y. Ch. 1816) (allowing suit against executor for selling property to his wife "at public auction, and *bona fide*, and for a fair price," "without showing actual injury").

In any case, *Thole* neither contradicts *Peters*, nor disturbs *Peters'* straightforward application to this case. *Thole* was concerned with whether beneficiaries *currently in* a defined benefit plan had standing to challenge poor investment decisions, when their pensions depended principally on the employer's duty to pay them, whether or not the plan had lost money. 590 U.S. at 541. The fiduciary duty invoked in *Thole* was to the plan, not—like here—to the individuals. *See Id.* at 538. The *Thole* Court therefore held that in light of the employer's duty to make up plan shortfalls, the plan participants did not have the same interest in plan assets as trust beneficiaries. *Id.* at 542. In contrast, the fiduciary duty invoked here is to the individuals who have been ejected from the plan, not to the plan itself. *See* 29 U.S.C. § 1132(a)(9) (cause of action for an "individual's" fiduciary rights in the case of ejectment).

### D. The Substantial Increase in Risk that Athene Will Default Is an Independent Ground for Standing

Even without Congress's decision to create a right of action to address precisely these circumstances, the Complaint plausibly alleges that Athene is a rerun of the Executive Life debacle: an employer terminated participants from a pension plan and forced them to an under-capitalized insurer peddling risky annuities. Lockheed's actions

52

constitute injury under Article III because, just like the Executive Life purchases, the purchase of the Athene annuity substantially increased the risk Pensioners will fail to receive their promised payments.

Lockheed maintains, citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), that the risk of default must be imminent, even if that would mean no recourse for ERISA violations where the default occurred after the statute of repose expires six years following plan termination. Lockheed Br. 16, 21, 29. That would, of course, be faint protection for pensions supposed to last decades. And Lockheed's position becomes even more nonsensical if one considers pensioners who have yet to retire. Under Lockheed's argument, if an employer ejects only those pensioners who were more than six years from retirement and gives them the financial equivalent of an annuity found in a Crackerjack box—one backed by no assets and clearly insolvent—pensioners would have no ability to challenge the transaction because they would have no expected benefits until the statute of limitations had run.

The Supreme Court has made clear that "[a]n allegation of future injury may suffice" for standing purposes if a litigant can show "the threatened injury is 'certainly impending' *or* there is a substantial risk

that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (emphasis added). Lockheed would turn this "or" into "and." In *Susan B. Anthony List*, as here, the substantial risk itself was the injury. *Id.* at 161. And in *Thole*, the Court accepted that "mismanagement of the plan so egregious that it *substantially increased the risk* that the plan and the employer would fail and be unable to pay the participants' future benefits" might be Article III injury, without so much as a word about "imminence." 590 U.S. at 546 (emphasis added).[11] The District Court properly found such a risk exists here.

Thus, the issue is "whether the Athene transaction exposed Plaintiffs to a 'substantial risk' of that harm occurring, such that they can bring their suit based on that transaction rather than waiting until their promised benefits do not arrive." *Doherty*, 2025 WL 2774406, at * 5. It did.

---

[11] The Secretary of Labor argues that the Supreme Court's statements in *Thole* should be disregarded as *dicta*. *See* DOL Br. at 15. But although the Supreme Court may be free to disregard its own *dicta*, *id.*, Courts of Appeals are not. *See, e.g.*, *Fusaro v. Cogan*, 930 F.3d 241, 254 (4th Cir. 2019) ("our Court is obliged to afford 'great weight to Supreme Court dicta.'" (*quoting Nat'l Labor Relations Bd. v. Bluefield Hosp. Co.*, 821 F.3d 534, 541 n.6 (4th Cir. 2016)); *see also Manning v. Caldwell*, 930 F.3d 264, 281 (4th Cir. 2019) (en banc) ("[W]e routinely afford substantial, if not controlling deference to dicta from the Supreme Court.").

Unlike the *Thole* plaintiffs, whose "complaint alleged that the plan was underfunded for a period of time" (although it was overfunded by the time it was on appeal), *Thole*, 590 U.S. at 546, Pensioners here pled chapter and verse of a "substantially increased risk" that their retirement payments will fail. *Id.* The complaint alleges ample reason to believe that Athene's promise to pay is much riskier than Lockheed's pension plan: high-risk illiquid assets that perform no better than safer and cheaper ones; excessive use of modified coinsurance with its Bermuda affiliate; unregulated offshore reinsurers; misalignment of interests between private equity and pensioners (as identified by the Department of the Treasury); and independent economic analysis that indicates Athene should only be chosen in "EXTENUATING CIRCUMSTANCES" (which Lockheed has never claimed exist here) because of its 21% risk of failure. *See* Compl. ¶¶ 46-56.

Lockheed asserts that "potential injury depends on an attenuated series of events. . . ." Lockheed Br. 17. But the entire point of the NISA analysis included in the Complaint is to give, on balance, the "quantified . . . economic loss to beneficiaries due to credit risk." Compl. ¶ 55. That analysis not only shows current economic loss, but also an overall risk

55

increase—the result of an impartial economic analysis based on credit spread differences—which in turn demonstrates that Athene has at least a one-in-five chance of being unable to pay out over the expected lifetime of the annuity. *Id.* In other words, because of Lockheed's actions, there is now a one-in-five chance that retirees will not be paid what they have been promised.

Lockheed attempts to pooh-pooh a one-in-five risk of catastrophic retirement failure, arguing that such a risk is insufficient because it is less than "a one-in-three chance" of occurring. Lockheed Br. 17. First, this defies common sense: any person on the street knows that a one-in-five chance of losing their retirement is "substantial risk." In response, Lockheed pins its hopes on *Beck v. McDonald*, 848 F.3d 262, 276 (4th Cir. 2017). Lockheed Br. 17. But as this Court recognized, "one might understand *Beck* to not extend beyond the context of data breaches and other similar informational injuries." *Holmes v. Elephant Ins. Co.*, 156 F.4th 413, 430 n.20 (4th Cir. 2025). What's more, as this Court recognized, the worse the potential outcome, the lower the probability likely needed to make the risk "substantial." A 20% chance of a hangnail may not be a substantial risk, but a 20% chance of losing a limb certainly

is. *See id.* ("[W]hat qualifies as a 'substantial risk' *might* vary from injury to injury—in other words, "substantial risk" might encompass expected value, not pure probability."); *accord Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1234 (D.C. Cir. 1996) ("The more drastic the injury that government action makes more likely, the lesser the increment in probability necessary to establish standing."). Under Lockheed's theory, defendants who lived near an airport would have no standing to sue if a planned runway had "less than [a] five percent chance" of sending a plane straight through their house. *See* Lockheed Br. 17. Article III does not countenance absurdity.

Alternatively, Lockheed claims that Pensioners have no injury because, in case of default, "SGAs will provide coverage *up to applicable coverage limits*." Lockheed Br. 32 (emphasis added). But the coverage limit is one sign of the SGAs' deficiency: in addition to lacking pre-funding, Compl. ¶ 32, SGAs' benefits (unlikely the PBCG) can be "exhaust[ed] in mere years if their insurer becomes insolvent." Compl. ¶ 32. "SGAs—which offer some protection but are insufficient to cover years of pension annuity payments, let alone decades of such payments—cannot adequately protect Plaintiffs or their putative class." *Doherty*,

57

2025 WL 2774406, at *7.  Indeed, the desire to avoid "lengthy lawsuits or incoherent state guarantee funds" led to the ERISA reforms including the Pension Annuitants Protection Act in the first place.  *Oversight Hearing on the Effect on Plan Participants of Insurance Company Failures, Hearing Before the Subcomm. On Labor-Management Relations of the Comm. On Educ. & Labor*, 102d Cong. 26 (July. 25, 1991) (Statement of Hon. Charles A. Hayes).[12]

In addition, the potential remedy underscores this difference: in *Thole*, the Supreme Court noted that if the employees were successful, the "outcome of this suit would not affect their future benefits payments." 590 U.S.C. at 541.  But the employees here are making a completely different claim, with different remedies: if they are successful, they will no longer have the worst annuity available; instead, Lockheed will have to post "adequate security" or provide "other appropriate relief" to assure

---

[12] Similarly, Lockheed asserts that "If the group annuity contracts become underfunded, Athene will be required to establish additional reserves." Lockheed Br. 26. But its citation of authority, *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013), concerns an ERISA-covered defined benefit plan, not an annuity provider; for an ERISA-covered plan, the employer, not the plan, assures payment. *Id.* at 330. That is the opposite of what happens here, where if Athene runs short of funds (as happened to Executive Life), there is no entity left to contribute.

that Pensioners actually receive all their retirement benefits. *See* Compl. (Prayer for Relief).

Lockheed also makes much of the ability of the Department of Labor to "sue under ERISA if there is an actual or imminent loss of benefits within the *first six years of the transaction*." Lockheed Br. 18-19. Never mind that the Department of Labor clearly lacks the resources to sue in every case. Moreover, six years is a blink-of-an-eye for Pensioners, many of whom must rely on their Lockheed benefits for decades. *See* Compl. ¶¶ 14-15 (noting that multiple named plaintiffs have retired as of 2020). Effectively immunizing Lockheed if it purchases an annuity which totters along for six-years-and-a-day is not the purpose of ERISA.

Nor does "su[ing] the insurer," Lockheed Br. 19, present a safe alternative for the Pensioners confronted with a risky annuity. For starters, the entire reason for such a suit in the first place would be because the insurer *lacks* the funds to pay. By the time such a suit commenced, it would be too late. Second, such a suit would be just one among many, because Athene (like Executive Life) will take years to unwind after its failure. *See, e.g.,* California Department of Insurance,

59

Settlement in Executive Life Insurance Case Ends 16 Years of Litigation (Jul. 9, 2015) [available at https://www.insurance.ca.gov/0400-news/0100-press-releases/archives/release068-15.cfm].   All the while, Pensioners would go without their hard-earned retirement benefits. None of these potential band-aids saves Pensioners from the grievous wound inflicted on their retirement by the ballooning risk that they will lose retirement payments as a result of the Athene annuity purchase.

### E.    Lockheed's Selective and Questionable Proffered "Facts" Are Outside the Scope of the Complaint and Should Not Be Considered at This Stage

In a last-ditch attempt to defeat the well-pleaded Complaint, Lockheed proffers a variety of "facts" that are beyond the scope of the Complaint and not appropriate for consideration at the motion to dismiss stage.   Although Lockheed may seek to raise these issues on summary judgment, attempting to rebut the Complaint's well-pled factual allegations is not the purpose of the motion to dismiss, where courts "accept as true all of the factual allegations contained in the complaint" and draw all reasonable inferences in plaintiffs' favor.   *See* Slip Op. 11, citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).   On summary judgment, of course, Pensioners will have the opportunity to present evidence about

Athene's financial condition obtained in discovery, not just the curated information Lockheed offers. *See Doherty*, 2025 WL 2774406, at *6 & n.7 (rejecting defendants' attempts to inject facts into the case through extrinsic documents meant to "controvert the conclusion" that Athene is at "substantial risk of default").

Consider, for example, the following selective assertions by Lockheed that Pensioners have not yet had the ability to challenge: First, "ring fencing." The Complaint plausibly alleges that Athene's risky structure, including the use of unregulated transactions, circular transactions with offshore affiliates, and risky investments leaves it teetering on the edge of solvency, risking loss of Pensioners' payments in an economic downturn in particular. *See* Compl. ¶¶ 50-52. In response to these well-pleaded allegations, Lockheed asserts that the assets are held "in a ring-fenced, separate account at Athene . . . protected from Athene's general creditors, and Athene has a contractual obligation to ensure that the separate account is adequately funded." Lockheed Br. 36. These are classic factual statements long held not appropriate to consider at the motion to dismiss stage. *See, e.g.*, *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (1999) ("The purpose of a Rule 12(b)(6)

motion is to test the sufficiency of a complaint[.]"); *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) ("[I]mportantly, [a motion to dismiss] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.").

Lockheed argues the Court may consider this factual assertion because the Complaint "refers to and relies" on the contract. *See* Lockheed Br. 10, n.3; *citing* Compl. ¶ 58. But the contract is not incorporated by reference into the Complaint merely because the complaint states that "Lockheed Martin's purchase of the group annuity contracts was effective on that date." Compl. ¶ 58. Indeed, at the time Pensioners drafted the Complaint, they did not even possess the contracts that Lockheed later introduced. More important, even if a court may take notice of the contracts (which the District Court did not), that court may not assume the truth of assertions embedded in those contract provisions, or assume that the contractual provisions are being followed. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (at most "the court is to consider [incorporated documents] on a Rule 12(b)(6) motion only to determine *what* the documents stated, and *not to prove the truth of their contents*." (citation omitted). Such factual assertions are for Lockheed's

answer to the Complaint (and summary judgment), not a facial standing challenge.

Second, consider Lockheed's selection of Athene.  The Complaint alleges that "Lockheed Martin failed to lawfully discharge its duties in selecting Athene," Compl. ¶ 60, and that "Lockheed Martin transferred pension liabilities to [Athene]."  Compl. ¶¶ 57-58 (listing billions of dollars of pension obligations and plan assets transferred); Compl. ¶ 72 ("Defendant selected Athene").  In response, Lockheed claims it did not select Athene, pointing to "documents provided to the district court." Lockheed Br. 11, n.4.  Again, such documents may (or may not) be accurate, but are not appropriately considered at this stage, where Pensioners have not had adequate opportunity to independently assess them.

## CONCLUSION

For the reasons explained above, the Court should affirm the District Court's denial of the motion to dismiss.

January 23, 2026                    Respectfully submitted,

                                    */s/ Cyril V. Smith*

Elizabeth Hopkins                   Cyril V. Smith
HOPKINS ERISA LAW                   Aaron S.J. Zelinsky
12123 Laurel Terrace Drive          ZUCKERMAN SPAEDER LLP
Studio City, CA 91604               100 East Pratt Street – Ste 2440
Tel: (301) 938-7516                 Baltimore, MD 21202
hopkinserisalaw@outlook.com         Tel: (410) 332-0444
                                    Fax: (410) 659-0436
                                    csmith@zuckerman.com
                                    azelinsky@zuckerman.com


Sean E. Soyars                      Bryan M. Reines
Jerome J. Schlichter                ZUCKERMAN SPAEDER LLP
SCHLICHTER BOGARD LLC               2100 L Street – Ste 400
100 South 4th Street – Ste 1200     Washington, D.C. 20037
St. Louis, MO 63102                 Tel: (202) 788-1800
Tel: (314) 621-6115                 breines@zuckerman.com
ssoyars@uselaws.com
jschlichter@uselaws.com


*Counsel for Appellees*

**CERTIFICATE OF COMPLIANCE**

In conformance with Local Rule 28.1(e)(2(B) and Rule 32(f) of the Federal Rules of Appellate Procedure, this brief contains 12,766 words.

This brief complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

*/s/ Cyril V. Smith*
Cyril V. Smith
Aaron S.J. Zelinsky
ZUCKERMAN SPAEDER LLP
100 East Pratt Street – Ste 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
csmith@zuckerman.com
azelinsky@zuckerman.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 23, 2026, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.

/s/ Cyril V. Smith
Cyril V. Smith
Aaron S.J. Zelinsky
ZUCKERMAN SPAEDER LLP
100 East Pratt Street – Ste 2440
Baltimore, MD 21202
Tel: (410) 332-0444
Fax: (410) 659-0436
csmith@zuckerman.com
azelinsky@zuckerman.com